# SANDERS et al., Respondents, v. DIXON et al., Appellants.

**St. Louis Court of Appeals, October 17, 1905.**

1. **PRACTICE: Change of Venue: .Disqualifying Other Judges.** Under section 832, Revised Statutes of 1899, providing for changes of venue in the city of St. Louis, from one court to another court of record therein, "unless the application is based upon grounds applicable to all the judges thereof," the applicant for change of venue can not disqualify other judges than the one from whom the venue is taken; it is within the discretion of such judge to determine whether the other judges of the city are disqualified and it is not error for him to transfer the cause to another judge of the city against whom the application is also leveled.

2. ————: **Parties: Building Restrictions.** In an action to enjoin the erection of a building contrary to restrictions in the deed by which the owner acquired the property and to compel the removal of such building, the contractor who erected the building, there being no temporary restraining order, was not a necessary party.

3. ————: ————: ————. In such case one who assumed to act as owner of the property and took a hand in the improvement, was a proper party.

4. ————: ————: **Interest Acquired Pending Action.** In an action to enjoin the erection of a building upon a lot in violation of building restrictions in the owner's deed, the holder of a mortgage executed prior to the commencement of the suit upon which no money was advanced until after the commencement of the suit, was not a necessary party.

5. **APPELLATE PRACTICE: Incomplete Record: Stipulation.** In an equity case pending on appeal, where part of the evidence introduced at the trial is withdrawn from the record by stipulation, and the effect of other parts stipulated instead of given in full, and exhibits added by stipulation to the transcript, the record as so amended with such exhibits may properly be considered on appeal.

6. ————: **Stipulation.** Where stipulations attached to the transscript on appeal refer to the averments of the petition for the purpose of determining an issue, the allegations of the petition will be considered by the court in determining that issue, notwithstanding there is some evidence which suggests the contrary.

7. **BUILDING RESTRICTIONS: Prima Facie Case: Damage Unnecessary.** The essential fact necessary in sustaining an action to enjoin the erection of a building in violation of building restrictions in the owner's deed, is that the covenants containing the restrictions inured to the benefit of the complainant and were broken in a substantial way by the defendant; it is not necessary to show that damage resulted from the breach.

8. ———: ———. In such an action a stipulation by the parties that plaintiffs and the defendants derived their titles from a common source and were mutually subject to the restrictive covenants, is sufficient to establish the right of the plaintiffs to sue the defendant without inquiring how the right was derived.

9. ———: **"More Than One Dwelling House."** A covenant in a deed providing that the grantee shall not erect "more than one dwelling house on each lot" conveyed, was violated by the erection of a double two-story building with a division wall running through it on the center line from front to rear and from cellar to the roof, designed for the use of more than one family.

10. ———: **Remedy for Violation.** In an action to enjoin the erection of a building in violation of a restrictive covenant in the owner's deed against the erection of "more than one dwelling house" on a lot, where the building has already been erected contrary to the covenant and where the building can be easily altered so as to make it comply with the restriction, the court should not order its removal without affording the defendants an opportunity to alter it.

11. ———: ———: **Expiration of Restrictions.** In an action to enjoin the violation of building restrictions contained in the owner's deed, where the building in violation of the covenant is already erected, and, before the termination of the case, the time limit for the restrictions has expired, the court will not order the removal of the building, but may award damages.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

REVERSED AND REMANDED.

*Thurman, Wray & Timmonds* for appellants.

(1) Where an application for a change of venue in the circuit court of the city of St. Louis is based upon

grounds applicable to all of the judges of such city, the change of venue must be granted to some circuit outside of the city of St.Louis. Sec. 832, R.S.1899; sec. 2261, R.S. 1889; amend., Act 125, p. 92; State ex rel. v. Flournoy, 160 Mo. 324; Penfield v. Vaughan, 169 Mo. 371; Douglass v. White, 134 Mo. 234. (2) It is a general rule of equity pleading that all persons who are materially interested in the suit, or the subject-matter of a suit, however numerous, should be made parties, either plaintiff or defendant. 15 Am. & Eng. Ency. of Pl. & Pr., 584; Markwell v. Markwell, 157 Mo. 332; Sampson v. Mitchell, 125 Mo. 228; Erisman v. Erisman, 59 Mo. 371; Dillon's Admr. v. Bates, 39 Mo. 299; White v. Watkins, 23 Mo. 429; Caldwell v. Toggert, 4 Pet. 202; Meeker v. Sprocher, 87 Va. 162. (3) Courts of equity adjust their decrees so as to meet the exigencies of the case. They vary, qualify, restrain and model the remedy so as to meet the real and substantial rights of all the parties. 1 Story's Eq., secs. 28, 437, 439; Robins v. Latham, 134 Mo. 472. The law looks with disfavor upon restrictions which prevent the free alienation of property. Such restrictions are strictly construed, and all doubt as to the meaning of the restrictive clauses, or words, used therein are resolved in favor of free alienation. 4 Kent's Com., 131; I Wash. R. P., 317; Sonn v. Heilburg, 56 N. Y. S. 341; Hutchison v. Ulrich, 145 Ill. 336; McMurty v. Phillips, 103 Ky. 308; Postal Co. v. Western Co., 155 Ill. 347; Livingston v. Stickles, 7 Hill. 255; Crusoe v. Bugby, 2 W. Bl. 776; Eckhart v. Iron, 128 Ill. 582. (4) The word, "dwelling," means, "a habitation, place of residence, abode, domicile." "Dwelling house," "a house intended to be occupied as a residence, in distinction from a store, office, or other building." Webster's Dic., Unabridged; Worcester's Dic.; Johnson's Dic.; Century Dic.; Abbott's L. D.; I Bouvier's L. D., 514; Bishop's Stat. Cr., sec. 207; 2 Bishop's Cr. L., sec. 104; 1 Wharton's Cr. L., sec. 787; 10 Am. & Eng. Ency. L. (2 Ed.), 353; N. Y. Fire Dept. v. Buhler, 35 N. Y. 182; Corey v.

Schuster, 44 Neb. 275; Levy v. People, 19 Hun 586; State v. Troth, 36 N. J. 422; Harvey v. Luce, 31 Me. 346; Davis v. State, 38 O. St. 506; Scott v. State, 66 Miss. 782; Bell v. State, 20 Wis. 601; Bruce v. Claudman, 45 N. H. 37; Townsend v. St. Marylebone L. R., 7 C. P. 143; Thompson v. Ward L. R., 6 C. P. 327; State v. Meerchouse, 34 Mo. 344; State v. Jones, 106 Mo. 302; State v. Jones, 171 Mo. 401. (5) It is not necessary, in order to constitute a dwelling house, or dwelling, that the whole building should be occupied by one family. Several families may occupy separate apartments in one dwelling. 10 Am. & Eng. Ency. L., 354; In re Hicquard, 24 Q. B. Div. 75; Swift v. Penn. Ry. Co., 13 W. N. C. 91; People v. Harrigan, 68 Mich. 491; Smith v. Birmingham Water Co., 104 Ga. 315. Tenement and apartment houses are classed as dwellings when hotels are not, under a statute regulating the height of dwellings in the city of New York. People ex rel. v. D'Oench, 111 N. Y. 359. (6) The remedy by injunction is always refused when restrictions have been ignored in the restricted district. In the restricted district, as shown by this record, the restrictions have been ignored for years. Hensley v. Marlborough Hotel, 55 Atl. 994. (7) Where the restrictions have expired, a court of equity will not require a building in violation of the restrictions to be torn down, or removed, for the very good reason that it could be immediately rebuilt again. Holt v. Fleishman, 74 N. Y. S. 894; Kirts v. Potter, 60 N. Y. S. 764; Hurley v. Brown, 66 N. Y. S. 295; Longworthy v. Dean, 44 N. Y. S. 433.

*Randolph Laughlin* for respondents.

(1) By invoking the jurisdiction of Judge Hough instead of that of the general term, appellants limited their application to the limited jurisdiction which they invoked, and Judge Hough was authorized to sustain the application as to himself, and to regard such aver-

ments as did not come within his jurisdiction as mere surplusage. State ex rel. v. Woodson, 86 Mo. App. 263. (2) Section 822, Revised Statutes 1899, does not confer an arbitrary right on an applicant for change of venue to disqualify judges other than those to whom his application is made. The power to disqualify other judges lies with the judge to whom the application is made, and is to be decided upon such evidence as may be offered in support of the charge, if any, and if none, then on the best knowledge and belief of the judge to whom the application is made. State ex rel. v. Wofford, 119 Mo. 408; Gee v. Railway, 140 Mo. 314. (3) (a) The above presumption is especially applicable to the action of the circuit court in making its decree against all three appellants. (b) Independent of the foregoing, there is still enough left in the meager fragments which have survived the appellants' pruning process to show that both Hynson and Hunter were necessary and proper parties, both to the suit and the decree. Hynson, pp. 82, 120, 213, etc.; Hunter, pp. 120, 226, etc. (c) Where as in this case, a building restriction confers a negative easement, the license to remove a wrongful obstruction from that easement comes from the owners of the easement, and from the court; and he who wrongfully obstructs the easement cannot evade the decree requiring him to remove his obstruction by the plea that he has not a further and special license from his co-defendants, as owners of the fee, when they are parties to the same decree with himself. In such a case the plaintiff's right to a mandatory injunction against all the violators of his easement is undoubted. Hall v. Wesster, 7 Mo. App. 56; Meriwether v. Joy, 85 Mo. App. 634; Coughlin v. Barker, 46 Mo. App. 54; Sharp v. Cheatham, 88 Mo. 508; Improvement Co. v. Tower, 158 Mo. 282. (4) If this were not sound, the decree could be vacated as to either Hynson or Hunter, and allowed to stand as to the other parties. St. Louis v. Lanigan, 97 Mo. 175; Neenan v. St. Joseph, 126 Mo. 89; Dickerson v. Chrisman, 28

Mo. 134; Christopher v. Kelly, 91 Mo. App. 101; Bensieck v. Cook, 110 Mo. 173; State ex rel. v. Tate, 109 Mo. 265. The protecting clause of the restriction which the respondents have all along invoked is not involved in the word "dwelling." It is involved in the words "not more than one." There is no controversy here over the meaning of the word "dwelling." In the plain and ordinary acceptation of the term, as used in the deeds in evidence and under review by the trial court, as used in the restrictions which are admitted by stipulation to exist on the property in suit, and as used in the criminal law, in the homestead law, and in the various building and election laws, it is conceded to mean substantially the same thing, to-wit: "The house in which a man lives with his family; the apartment, or building, or group of buildings occupied by a family as a place of residence; the place in which a man with his family reside." 13 Am. and Eng. Ency. of Law (1 Ed.), p. 1016, and citations in note 1; Gillis v. Bailey, 21 N. H. 143; Black's Law Dict. (1891), p. 403; Bouvier's Law Dict., p. 627; Mason v. People, 26 N. Y. 200; Thompson v. Ward, L. R., 6 C. P. 365; Ellis v. Burch, L. R., 6 C. P. 327; Cincinnati College v. Yeatman, 30 Ohio St. 282-283; The State v. Mayor, 1 Dutch. 525; Detroit v. Mayor, 3 Mich. 172; The State v. Leester, 4 Dutch, 103; Logan v. Washington Co., 29 Pa. St. 373; Rhodes v. McCormick, 4 Ia. 368; Lloyd on Building and Buildings, sec. 193; Coke on Littleton, sec. 59 (48b); People v. D'Oench, 111 N. Y. 359; People v. Bush, 3 Park 556; Musgrove v. Sherwood, 53 How. Pr. (N. Y.) 311; Loring v. Bacon, 4 Mass. 575; Wiggin v. Wiggin, 43 N. H. 563. Each of the four dwellings in suit constitutes a complete dwelling, within the meaning of any definition of that word given by any of these numerous authorities. (5) The relief awarded respondents was entirely consistent with all the precedents. Meriwether v. Joy, 85 Mo. App. 634; Hall v. Wesster, 7 Mo. App. 56; Daniel v. Ferguson, 2 Ch. 27; Gillis v. Bailey, 21 N. H.

149; Clark v. Martin, 49 Penn. 289; Western v. MacDermott, L. R. 2 Ch. 72; Durell v. Pritchard, L. R. 2 Ch. 244; Yates v. Jacques, L. R. 2 Ch. 95; Warren v. Clarion, 54 Penn. 38.

GOODE, J.—1. This case was instituted in the circuit court of the city of St. Louis and was assigned for trial to division No. 1, presided over by Judge Warwick Hough. Before filing an answer, Charles Dixon, one of the three defendants, presented an application for a change of venue, alleging that he could not have a fair and impartial trial before the judge of that division, on account of the judge's prejudice, and alleging, further, that he could not have a fair and impartial trial in any of the other divisions of the circuit court of St. Louis, on account of the prejudice of the judges of said court against him. The application was, in fact, one for a change of venue to some court outside of the city of St. Louis. Judge Hough of division No. 1, granted the change from his division, but refused to send the case outside the city and ordered it transferred to division No. 5 of the circuit court of the city, presided over by Judge Fisher. An exception was saved to the refusal to award a change to some outside court and this ruling is assigned for error and demands first attention. The application for the change was made on the 4th day of November, 1901, when the provisions in regard to changes of venue, contained in the Revised Statutes of 1899, were in force. The article on change of venue contained in those statutes is declared applicable to the city of St. Louis, and it is provided that the word "county" used in the article shall be construed to embrace that city, and that changes of venue be awarded to and from the courts of that city as if it was a county. It is further provided that if a change is granted from any court of record in the city, the cause shall be sent to some other court of record therein, "unless the application is based upon grounds applicable to all the judges thereof, or to

all the inhabitants of said city." [R. S. 1899, sec. 832.] On the clause of the statute just quoted, the defendants found their contention that it was the duty of the judge of division No. 1 of the circuit court of the city of St. Louis, to grant a change of venue to an outside circuit, as Dixon alleged in his application · prejudice on the part of the judges of the other divisions of the St. Louis circuit court which would prevent a fair trial before any of them; thus showing that the application for a change from Judge Hough was based on grounds applicable to all the judges of the circuit court of St. Louis. The policy of the Legislature, as shown by several enactments on the subject, has been to require causes pending in one of the courts of record of the city of St. Louis to be tried in that city instead of being transferred to some outside circuit on change of venue. The Statutes of 1865 provided that no change of venue in civil cases should be allowed in any court in St. Louis county to any other county. [Gen. Stat. 1865, sec. 13.] At that time the city of St. Louis was in St. Louis county and for that reason the wording of the section was as stated. By the Session Acts of 1865-66, it was provided that no change of venue should be allowed from the circuit court of said city because of the disqualification of any one of the judges thereof, but only in case two of the judges were disqualified. At that time there were three judges of the circuit court of the city of St. Louis, who sat at stated intervals in general term and had power to review points of law decided at special terms. [Acts 1865-66, p. 72, sec. 7.] In the Revised Statutes of 1879 it was said that the word "county," as used in the article on changes of venue, embraced the city of St. Louis and changes might be awarded to and from the courts of St. Louis as if it were a county. [R. S. 1879, sec. 2742.] The section last cited was amended in 1881 so as to read as it now appears in section 832 of the Revised Statutes of 1899; that is to say, the amendment provided that if a change of venue was asked from a

court in the city of St. Louis, the cause should be sent to some other court of record therein, unless the application was based on grounds applicable to all the judges. [Acts 1881-82, sec. 176.] The statutes regarding the practice in the two divisions of the criminal court of the city say that when a change of venue has been applied for in the criminal court on a ground disqualifying one of the judges, the cause shall be transferred to the other division of the court. [Scheme and Charter, art. 17, sec. 38.] So much for the policy of the law, which is obviously to have causes instituted in St. Louis courts of record tried in some division thereof. But the argument is that by virtue of the amendment of 1881, any judge of a division of the circuit court where a case is pending is bound to send the case outside the city if the application for change of venue is based on grounds applicable to the judges of all the divisions. In view of the tenor of the law exhibited in the statutes we have cited, this position ought not to be adopted if the present statutes fairly admit of a different one. There are now twelve divisions of the St. Louis Circuit Court, presided over by as many judges, and there were nine divisions and judges at the time the application in the present cause was made. The question for decision is, did the application of defendant Dixon of itself disqualify all those judges by alleging prejudice against all of them, and compel Judge Hough to send the case to some other circuit? We think the clause of the statute invoked by the defendants had no such purpose. The statutes provide that when a change of venue is prayed for any reason tending to show the applicant cannot have a fair trial in the venue where the cause is pending, it shall be transferred "to some county in the same, adjoining or next adjoining circuit where the causes complained of do not exist." [R. S. 1899, sec. 822.] The phrase, "where the causes complained of do not exist," has been seized on in several cases to support the theory that if the applicant alleges ground for a change, such as prejudice or undue influ-

ence, not only in the particular county, jurisdiction or forum where the cause is pending, but in other counties or courts, the judge to which the application is presented must send the cause to some county or court against which no disqualifying allegation is preferred. [Gee v. Railroad, 140 Mo. 314, 41 S. W. 796; State ex rel. v. Wofford, 119 Mo. 408, 24 S. W. 1009; State ex rel. v. Woodson, 86 Mo. App. 253.] This theory has never received the indorsement of the courts. It was decided in State ex rel. v. Wofford that a defendant under indictment for a felony could only disqualify one judicial circuit on the ground of prejudice of the inhabitants. That was on a statute providing that when the inhabitants of an entire circuit were so prejudiced against a defendant that a fair trial could not be had therein, the cause should be removed to another circuit in which such prejudice was not "alleged to exist." [R. S. 1889, sec. 4154.] The relator Cottrell, in the Wofford case, swore to a prejudice on the part of the inhabitants of the circuit where the indictment was found and also to a prejudice in the minds of the inhabitants of counties outside that circuit. It was held that though he alleged prejudice as to those outside counties, and though the statute said the cause must be sent to a circuit in which the prejudice was not *alleged* to exist, the judge to whom the application was made was justified in sending the case to any county outside the circuit where it was pending.

In State ex rel. v. Woodson, 86 Mo. App. 253, the relator in a cause pending in the circuit of Buchanan county applied for a change of venue. That court consisted of two divisions presided over by different judges. The application sought to disqualify, on account of undue influence, not only the judge to whose division the cause was assigned, but the judge of the other division too. Nevertheless the case was transferred to the other division and it was held the ruling was right. The contention on appeal was that the cause

should have been transferred to a court where the cause
complained of did not exist; but it was held that while a
party applying for a change of venue may disqualify the
judge to whom the application is made, by alleging pre-
judice or undue influence, no other judge can be dis-
qualified in that way, but the judge hearing the applica-
tion must decide in what other courts or counties the
causes complained of exist. The same construction of
the statute was adopted by the Supreme Court in Gee
v. Railroad, 140 Mo. 314. Now, let us see what bearing
those decisions have on the point in hand. If the
amendment of 1881, relating to changes of venue in the
courts of St. Louis, had stopped with these words: "if
such change be asked or granted from any court in said
city, the cause shall be sent for further proceedings to
some other court of record in said city," possibly it
would have been mandatory on a judge granting a
change of venue from his division to send the cause to
some other court in St. Louis without inquiring whether
the causes complained of existed in the latter court or
not. In other words, the amendment might have ex-
punged, so far as the city of St. Louis is concerned, that
provision of section 822 of the Revised Statutes of 1899
(sec. 3733, R. S. 1879), which says, the cause shall be
sent to some county where the causes complained of do
not exist. To prevent the amendment from having such
a result, and to put the law in St. Louis in clear har-
mony with the law elsewhere, the amendment of 1881
added the words: "unless the application is based on
grounds applicable to all the judges of said court therein
or to all the inhabitants of said city." The obvious pur-
pose of this clause was to save to the city of St. Louis
the provision we have quoted from section 822 and re-
quire the cause to be transferred to another court of the
city, if there was one where the causes complained of
as operating against a fair trial did not exist. The
provision, therefore, is to receive the same interpreta-
tion that is put on said clause of section 822, providing

for a change to a county where the causes complained of do not exist. As we have seen, the interpretation of that clause is, not that the applicant for the change of venue can disqualify by his oath other counties, but that the court to which he applies must determine whether the same causes exist in a given tribunal to which the cause may be sent. Therefore, we must hold that Judge Hough might determine whether the other judges of the St. Louis Circuit Court were prejudiced against defendant Dixon, and that said judge alone could disqualify the other judges. The decision in State ex rel. v. Flournoy, 160 Mo. 324, is not opposed to our ruling, as a different statute was involved in that case; and, besides, it was assumed, instead of decided, that an applicant for change of venue could disqualify more than one judge.

2.   The suit is one in equity to restrain the erection and maintenance of a building or buildings designed to be used as flats on lot 55, Clemens Place, in the city of St. Louis. This addition to the city was laid out and platted about 1885 and divided into lots sixty feet wide. In the deeds, made by the owners of the addition to the purchasers of the various lots, restrictions were imposed as to the houses to be erected by said purchasers. The defendant Dixon is the owner of lot 55, on the north side of Cates avenue. According to the allegations of the petition, the deed under which he took title to the lot, like all the deeds to the different vendees of lots in the Place, contained the following covenants:

"First.   The front building line of any building erected on said realty shall not be less than twenty feet from the north line of Cates avenue, whereon said property now fronts, and the frontage of said lot shall continue to be on the north side of said Cates avenue. No building or fence constructed of lumber more than two feet in height, shall be erected between said building line and said avenue.

"Second.   No dwelling shall be erected on said realty whereof the main part is less than two stories in

height, nor shall there be erected more than one dwelling on each lot.

"Third. No stable, shed, or other building shall be erected within ten feet of the rear line of said lot.

"Fourth. No dairy, nor manufactory, nor trade, nor business, nor nuisance shall be conducted on or permitted to exist on said premises."

Shortly after purchasing the lot, that is to say in 1901, Charles Dixon and Montrose P. Hynson, for whom Dixon is charged to have held the property in trust, set about erecting flats on it for the use of four families. The defendant Hunter did the carpenter work on the structure. Plaintiff Sanders owned lot 54 adjoining lot 55, and the other plaintiffs owned lots in the vicinity. Sanders notified Dixon and Hynson that he and other property-owners similarly affected, would oppose the erection of the proposed flats as an infringement of the restrictive covenants under which the lots in the addition were sold. Hynson replied that such covenants were not good; that he had built flats in other additions where there were similar covenants. A temporary restraining order was granted which stopped the work for a while; but, as the court refused to continue this order without a bond from the plaintiffs and as they failed to furnish a bond, the temporary order was dissolved and the defendants proceeded with the erection of the flats, which were completed in due season. Subsequently the cause was tried and a decree entered perpetually enjoining the three defendants from allowing the building to remain on lot 55, and commanding them to remove it in ninety days, or in default of their beginning to remove it in sixty days, that the sheriff remove it at their expense.

It appears from the evidence that the edifice contained four flats of six rooms each, two below and two above. The structure is two stories and a short attic in height, with a basement beneath. The outside walls stand on a continuous foundation and the building is

under one roof. Each of the four flats has a separate front entrance. In the rear, we glean, there is a doorway giving access to an inclosed court about ten feet square from which any flat may be entered. Just how this rear entrance is arranged is somewhat obscure. A brick wall bisects the edifice from front to rear, except through said small court, and arises from the cellar floor, through the mansard to the roof. In the basement the wall is eighteen inches thick and above it is thirteen inches. There is an archway through it in the basement. The basement is divided into four apartments designated on the plan as laundries. Each of the flats has a separate kitchen and other conveniences, consists of six rooms and, concededly, was designed for occupancy by a family.

The principal controversy is as to whether the edifice we have described constitutes a breach of the covenant against the erection of more than one dwelling on a lot; but before taking up this question it is necessary to deal with some minor ones.

Prior to the filing of their answer, the defendants filed a plea in abatement in which a defect of parties defendant was pleaded, in that one Gray, the holder of a promissory note secured by a deed of trust on the premises, was a necessary party. It is also further urged by the defendants on this appeal that the circuit court erred in decreeing that Hynson and Hunter, who owned no interest in the premises, as well as Dixon, should remove the flats from the lot.

(a)    The evidence clearly shows that Hunter was simply a contractor doing work on the building, and we think it was erroneous to impose on him the expense of removing the building. A mechanic working on a house, or even a contractor, ought not to be held bound to proceed at his peril because, on grounds like those in this cause, an injunction suit has been begun to stop the work, but no temporary writ is in force. It is enough to require, in the final decree, that the real parties in in-

terest shall make good whatever wrong has been done by erecting an unlawful structure.

(b) Whether Hynson was interested in the title to the lot cannot be determined positively from the record; and it may be stated that there is uncertainty about who owns the premises. Dixon took the title by conveyance from T. A. Davidson, but swore he (Dixon) was a straw-man in the transaction and did not know who the real owner was. It is certain that Hynson was concerned about the building of the flats, was on the premises while they were in process of erection, was notified by Sanders not to proceed with the work and declared he intended to disregard the restrictions: that he assumed to act as owner by refusing, as too little, an offer for the lot; and in other ways took a hand in making the improvement. We think is sufficiently appears he was an active party in the work to prevent us from interfering with the decree of the lower court against him. Besides, some of the deeds in evidence may have shown he was the true owner, as the petition alleges.

(c) We hold that Gray was no necessary party. In fact, he acquired the note secured by the deed of trust, just before this case was tried in the circuit court and long after the filing of the notice of suit in the office of the recorder of deeds. The suit was instituted February 18, 1901. On January 22d of that year Dixon gave a note for $10,000 secured by a deed of trust on the premises: Charles Nicholls was the party of the second part in the deed and Geo. A. Duff the third party. The instrument was recorded February 7, 1901; hence, before the institution of the suit or the filing of notice. But the evidence conclusively shows no money was furnished on the note until afterwards. Dixon appears to have acted in the interest of Nicholls and Ritter, who were engaged in the real estate business in St. Louis. He received no money and had no personal interest in the matter. The money was used in paying, in installments, the cost of the improvement as the work progressed.

Nicholls swore the custom of his company in making such loans was to exact a note and deed of trust from the owner of the property; advance, as needed, out of their own funds, money to pay for the construction of the house and finally sell the note to some client. That course was followed in this case and Gray, who is now said to be a necessary party, purchased the note, not only after the suit was brought, but while it was on trial. Nicholls and Ritter, who were the real parties to the loan up to that time, furnished the money after the institution of the action and filing of notice of suit, and after they had received actual notice in writing from the attorney of the plaintiff that the erection of the flats would be contested. Gray having acquired his interest pending the suit, acquired it subject to any decree that might be rendered. [O'Reilly v. Nicholson, 45 Mo. 166; Turner v. Babb, 60 Mo. 342.]

3. It is insisted by plaintiff's counsel that this court cannot look into the merits of the case because portions of the evidence were withdrawn from the transcript. On August 15, 1902, two stipulations regarding the transcript were filed in the court below, one of which provided that all exhibits called for by the record might be set out separately at the end of the transcript, except exhibits covered by the other and annexed stipulation. The stipulation annexed provided that all deeds introduced in evidence and made exhibits should be omitted from the record; and that, in lieu thereof, the defendants admitted plaintiffs were the owners of the property as alleged, through and by virtue of the conveyances stated in the petition, and subject to the restrictions averred therein. It was further admitted that a warranty deed was executed to the defendant Dixon on January 22, 1901, by T. A. Davidson; that the title transferred was derived from a source of title common with that of the plaintiffs herein, and that said deed transferred title to said Dixon subject to the restrictions set out in plaintiffs' petition. It was further stipulated that all photo-

graphs should be omitted from the transcript and that the same were withdrawn by the parties. What is the effect of those two stipulations? One withdrew the photographs from the record, and as this was done by agreement, neither of the parties can oppose the consideration of the cause by this court on that ground. Another result was to substitute the stipulation of the parties regarding the effect of the deeds for the deeds themselves, of which thirty-five had been in evidence. But, aside from the deeds introduced as exhibits and the photographs, the parties were at liberty to attach to the transcript as exhibits, any document which had been introduced. The defendants have attached the plans for the building which were submitted to the city commissioner of public buildings; and we hold those exhibits were properly annexed under the stipulation and that we have the right to examine them in considering the case. They were neither deeds nor photographs and hence come within the first stipulation. One of the issues in the case was as to whether the restrictions in the various deeds had been ignored long prior to the erection of the flats in question, and whether the property-owners in Clemens Place had tolerated the erection of apartment houses therein, in violation of the restrictions; thereby waiving the right to insist on the covenants. Much documentary evidence was introduced on that issue which is not preserved in the transcript and, hence, we cannot consider the defense. We shall confine ourselves to the record and consider only those points as to which substantially all the evidence is before us. A very material defense is that by the terms of the deeds, the restrictions were to continue only twenty years and to expire in January, 1905. If this was true, the restrictions are at an end and flats may be constructed; but they were not at an end when this case was decided in the court below. It is contended by plaintiffs' counsel that the deeds cannot be examined by us, but we must accept the restrictions as alleged in the petition; and as the petition shows

no time of expiration, the case must be determined without reference to any time limit. Some evidence preserved in the transcript suggests that these restrictions lapsed in 1905, but falls short of proving they did; and the plaintiffs say positively they did not; say, too, that though some of the deeds under which Dixon got title may have put a time limit on the restrictions, other deeds of which plaintiffs may avail themselves, contained no limit. The stipulations of the parties confine us to the averments of the petition in ascertaining the character and duration of the covenants and expressly exclude the conveyances from the record filed in this court. Hence, we cannot decide that the restrictions have lapsed.

4. On the main proposition, as to the meaning of the covenant against the erection of more than one dwelling, it is strongly insisted for the defendants that the edifice actually erected constituted no breach; that it was, in fact, one dwelling and the restriction intended no more than to prohibit the erection on the lots in Clemens Place of two or more separate and detached buildings intended for dwellings. The position of the plaintiffs is "that not more than one dwelling" meant a house designed as a residence, for a single family.

(a) That plaintiffs' properties would be depreciated by Dixon't flats was shown. But the essential fact in a suit to enforce negative covenants regarding the use of land is, that the covenants inured to the benefit of the complainant and were broken in a substantial way by the defendant; not that damage resulted from the breach. [Hall v. Wesster, 7 Mo. App. 56; Bank v. Kennett Est., 101 Mo. App. 370, 389, 74 S. W. 474.] These restrictions were imposed to attract to Clemens Place a class of people possessing the means to build and maintain a certain grade of homes and who would constitute a congenial community, as well as to keep up the value of the property.

(b) The stipulation of the parties that Dixon and plaintiffs derived their titles from a common source and

are mutually subject to the restrictive covenants alleged, relieves us from the task of inquiring whether or not the burden of the covenants ran with the land or, if not, whether the different conveyances were so drawn as to make the covenants available to the plaintiffs as grantees of the original owners who imposed the restrictions. Courts incline to construe negative easements as continuing in favor of the grantor and all grantees holding under him. This is on equitable grounds rather than according to strict common-law rules concerning covenants. [Sonn v. Heilberg, 56 N. Y. Supp. 541; London, etc., Ry. v. Gomm, 51 L. J. (Ch. Div.) 530; Rogers v. Hosegood, 69 L. J. (Ch. Div.) 652.] That the defendants took subject to, and the plaintiffs enjoy the benefits of the restrictions on the use of lots in Clemens Place, is not contested.

(c) The word "dwelling" is one of multiple meanings; but the particular meaning intended to be expressed by it when used in a given instance, may be rendered obvious by the context or attendant circumstances; and usually resort must be had to those aids to interpretation to ascertain what is meant. In its broadest significance the word denotes a building used as a settled human abode; and, in common parlance, when not qualified, conveys the notion of a home; though a suite of rooms occupied by one man may be his dwelling-house (Evans and Finch's case, 1 Cro. Car. 473). This is so in the sense intended by a statute permitting one who has had a dwelling-house or place of business in England for a year to petition to be declared a bankrupt. [In re Hequard, 24 Q. B. L. R. 71.] The word has been held to include, for certain purposes, the curtilage and outbuildings appurtenant to a home. [Rogers v. Troth, 36 N. J. L. 422; State v. Langford, 12 N. C. 253.] For other purposes the curtilage is excluded. [Swift v. Railroad, 13 W. N. C. 91.] A set of apartments in a tenement house opening into a common hall, were ruled to be a dwelling house within the statute defining burglary.

[Mason v. People, 26 N. Y. 200.] And a hotel was held a dwelling in which the crime of larceny from a dwelling-house could be committed. [State v. Leedy, 95 Mo. 76, 8 S. W. 245.] Arson by burning a dwelling-house is committed by burning a jail and courthouse in which the jailer and his family reside. [People v. Van Blarcom, 2 Johns. 105.] These rulings exhibit some of the diverse senses attached to the word "dwelling-house" in judicial decisions and exhibit, too, how the sense varies according to the contextual language and the facts of the cases. But the meaning of "dwelling" and "dwelling-house" has been adjudicated in cases more analogous to the one at bar. Some support is lent to defendants' theory by the decision in Hutchinson v. Ulrich, 145 Ill. 336. In that case the covenant was that only a single dwelling, costing not less than $7,500, should be placed on each of the fifty-foot lots within the restricted territory. The purchaser of two contiguous lots commenced to erect on each of them a flat or apartment building four stories high, with a partition wall on the line between the two lots; and relief was sought against those structures as being in violation of the covenant. The decision was that the restriction was not broken, because the structure on each lot was a single dwelling, although constructed to be used by four families; that the restriction against plurality applied to the building itself and not to its use for residence purposes by several families, the grantor merely intending to prohibit the erection of several small buildings on each fifty feet of ground. This case has not met with universal approval and its interpretation of the phrase "single dwelling" has been the subject of some criticism. [Note to report in, 21 L. R. A. 390.] The court laid much stress on the fact that flats and apartments wherein several families might reside, were common in Chicago at the time, had been erected within a short distance of this very house, and therefore, the inference was reasonable that if the

grantor intended to prohibit the erection of a flat on the property he would have inserted an explicit covenant to that effect. It is uncertain if any flats had been built in St. Louis at the time the restrictions in question were imposed, and it is certain they were not then in general use; nor were there any in the neighborhood of Clemens Place. But the Hutchinson case is materially different from this one in the fact that the partition wall between the two parts of the building stood on the line between two lots, and hence only one flat or apartment building was on each lot. The partition wall of Dixon's flats is, as stated, in the center of his lot.

The case of Sonn v. Heilberg, 56 N. Y. Supp. 341, cited by the defendants, is not in point in the present controversy. The covenant considered therein provided that the buildings erected on the restricted land should be in every way adapted for use as a family residence, and the contention was that an apartment house was not a family residence. The court held that the only purpose of the covenant was to exclude business houses from the territory and make it a residence district; not to exclude the use of a building for more than one family. Of similar import is McMurtry v. Inv. Co., 103 Ky. 308, in which it was held that a covenant in a deed that the lot should be used for residence purposes only did not prohibit the erection of flats.

In Gillis v. Bailey, 21 N. H. 149, the covenant regarding the property was that only one single dwelling-house with sheds, barn and other outbuildings required for the use of the same, should, in twenty years of the date of the conveyance, be placed on the lot. The purchaser built a house two stories in height, designed to accommodate three families; but fitted up for and actually occupied by six families. There were doors connecting the whole building, but those between the separate tenants were kept fastened. The question for decision was the meaning of the phrase "a single dwelling-house." It was decided in effect to mean a dwelling in-

tended and constructed for the use of one family. The structure actually erected was held to be three separate and distinct residences or dwellings and to defeat the purpose of the covenant. Weight was allowed to recitals in the deeds of conveyance going to show the grantors intended to prevent crowded buildings and to preserve open spaces about the residences.

In Skillman v. Smathehurst, 57 N. J. Eq. 1, the covenant was that there should not be erected on the land sold a building other than for use as a private dwelling. This covenant was held to be broken by the erection of a flat containing three sets of apartments, on the ground that a flat was a community house, designed for the accommodation of more than one family, and not a private dwelling. The case is not very apposite, as the decision turned mainly on the meaning of the word "private."

In Harris v. Roraback, 100 N. W. (Mich.) 391, the covenant was that the vendee would not occupy the premises "except for one dwelling-house to each lot." The building said to conflict with the covenant consisted of a two-story building designed for two dwellings; one on the ground floor and one on the second floor, each with separate entrances and separate cellars; a single flat, in short. It was held that the words "one dwelling-house" could not be construed to mean a building planned and designed for two or more dwellings, but clearly meant a house designed for one family; thus holding, in effect, that each story was a dwelling. The opinion approved the case of Gillis v. Bailey and distinguished Hutchinson v. Ulrich on the theory that, in the latter case, the decision rested on the fact that flats had long been used near the property in controversy. That distinction was pertinent to the matter the Supreme Court of Michigan had before it; wherein, as well as in the Hutchinson case, the different dwelling places were superimposed in different stories, one above the other, and the inquiry was whether the stories were separate dwellings or dwelling-

houses. This circumstance is not so controlling in the present case; for here it is blended with the question of whether the partition wall made the east and west halves of the edifice in dispute, each a separate dwelling.

In Rodgers v. Hosegood, 69 L. J. Ch. Div. 59, there was a covenant that no more than one messuage or dwelling-house, and a suitable stable and outhouses, should be erected on the property conveyed. A large apartment-house or block of flats was built and it was held to infringe the covenant. That restriction, however, was much more definite than the one here involved, as the word "messuage," as well as the permission for suitable outhouses and stables, showed the intention of the covenantor to restrict the property to use as a homestead.

In Ilford Park Est. v. Jacobs, 72 L. J. Ch. Div. 699, the stipulation in the deed was that not more than one house should be erected on the lot. The structure complained of was a two-story flat designed for two families. There was a common-entrance archway, containing two front doors, but no internal communication between the apartments. This edifice was held to be two houses within the meaning of the covenant, and to be unlawful. The case is supported by Grant v. Langston, 69 L. J. (Priv. Coun.) 66, but seems to be opposed to Kimber v. Admans, 69 L. J. Ch. Div. 296, in which it was held that a covenant that not more than one house should be built on each lot of a tract of land, was not broken by the construction of a block of flats, two storys high, with apartments on the first and second floors, but only one building standing on each lot. Of similar effect is Att'y Gen. v. Mutual Tontine Assn., 44 L. J. Exch. (N. S.) 146. The foregoing are all the authorities we have found which are relevant to the immediate question. In our opinion the New Hampshire case is the most apposite and the best reasoned. The covenant dealt with in it is quite like the one in hand and the doctrine of the opinion is moderate. In holding that a single two-story flat with

separate suites of rooms above and below, is two separate and distinct dwellings, the judgments in Harris v. Roraback and Ilford Park Est. v. Jacobs, give a narrower meaning to the words "one dwelling" or "one dwelling-house" than we need to give in the present instance. Those decisions may be sound, but a similar ruling would be more extreme than the facts of this case demand. Whether a building is one dwelling-house or more depends on whether it was planned and constructed for plural homes, as much as on the actual use of it by several families for their homes. It may be occupied by two families and still be a single dwelling-house; and likely its continuance never would be enjoined, although arranged for plural residences, if not thus used. A house arranged for plural occupancy is much more likely to be used by several families, and to attract an unwelcome class of inhabitants into a restricted residence district, than a house arranged for single occupancy; and the former house might be held a breach of a covenant against more than one dwelling on a lot, when the latter would not be. But one two-story house thus arranged is less obviously a breach of the covenant than are two such houses side by side, and is surely less detrimental to the district. Now the edifice we are dealing with is so constructed as to be two houses, unless any building, however large, is one house if it rests on a continuous foundation and has a continuous roof. It is not a single two-story and attic building having two suites of separate apartments, one on the lower floor and one on the upper floor; but a double two-story and attic building of that sort, with a division wall running through it on the center line of the lot, from front to rear and from the cellar to the roof. On either side is a swelled or embayed front. The question is whether that building infringed the covenant against more than one dwelling. We concede that in disposing of this question we must resolve any doubt in favor of the free use of the property. The law prefers that the use of land in any lawful

mode shall be unhampered by restrictive covenants; and, therefore, courts decline to extend a stipulation limiting the use, beyond the clear meaning of the instrument when construed by the aid of the circumstances surrounding its execution. [Sonn v. Heilberg, 50 N. Y. Supp. 341; Hurley v. Brown, 60 N. Y. Supp. 816.] But all courts profess to give effect to the plain intention of the parties in imposing such restrictions, and should live up to their profession in good faith, instead of seeking ingenious subtleties of interpretation by which to evade restrictions. We shall endeavor to deal fairly with the covenants before us, interpreting them by the words employed, read in the light of the facts existing when the restrictions were imposed, and the objects to be attained. To the argument that the only purpose of the second stipulation was to interdict the erection of more than one detached residence on a lot, the answer is that this interpretation would largely nullify the benefits of the covenant. In St. Louis and all other large cities, there are numerous dwelling-houses built together in solid rows. Such structures often have continuous outside walls and foundations, but inside partition walls. They are always spoken of and regarded as different residences or dwellings; and sometimes they cover an entire block. It would be preposterous to call them one dwelling. Unquestionably a building of that kind was prohibited by the covenant in Dixon's deed; that is, putting more than one dwelling of the kind on a single lot. If it was not, what is the restriction worth? It might hinder the building of two detached residences, but two or three semi-detached residences would be lawful; that is to say, houses having continuous outside walls and constituting more than one dwelling on a lot. We think such a structure is no less obnoxious to the covenant because designed for use as flats by different families.

Defendants' counsel lay much stress on the division wall of Dixon's flats being a fire wall put in to comply with certain municipal regulations, and not a party

wall. The city ordinances are not before us, but we do not regard the point as material. It is no party wall in the legal sense, because both houses belong to one owner. It hardly would be claimed that the houses are one dwelling if two men owned them. Are they any the less plural dwellings because owned by one man? A brick wall thirteen inches thick, resting on a foundation eighteen inches thick, entirely separating the two halves of a building forty-five feet wide, each half of which is prepared for a home or homes, is, for all practical purposes, a partition wall between two dwellings, if not a party wall. It is as much a partition wall as the dividing wall between residences built in a solid row, each of two or more storys, but all the storys designed for the use of a single family. Our opinion is that the only ambiguity in the covenant is as to whether or not it prohibits one house planned for plural use as a dwelling. It certainly prohibits two houses planned for separate dwellings and divided by a partition wall which bisects the lot; and this is enough to sustain the plaintiffs' case against the continued use of Dixon's houses as now arranged.

5. While we agree with the learned chancellor who tried the case, that the building constituted more than one dwelling and was an infringement of the restrictions on the use of the lot, we do not agree that the proper disposition of the cause was to order the building removed. Courts have some discretion in granting an injunction respecting restrictive covenants affecting the use of lands. [St. Louis Safe Dep. Bk. v. Kennett Est., 101 Mo. App. loc. cit. 395.] They are disposed to uphold such restrictions according to their true meaning and this court is strongly of that disposition. Unless this is done, selfish and aggressive persons will encroach constantly on the rights of their neighbors. Injunctive relief against these encroachments is the only true remedy, and ought to be granted promptly in as full a measure as is needed to insure perfect protection to all parties in the enjoy-

ment of covenants made for the common benefit. But when relief is granted against such encroachments, it should be made as lenient as is consistent with enforcing the rights of the complaining parties. In our opinion the building in the present case can be altered so as to constitute one dwelling within the meaning of the deeds, at comparatively little expense and the evidence so shows. It cost thirteen thousand dollars and is of superior construction and attractive appearance. A few hundred dollars will pay for converting it into a single dwelling-house. Three-story private homes with two swelled fronts are not uncommon in St. Louis. It was the duty of the court to afford the defendants an opportunity to make the alteration. The only argument pressed against this view is that the intention of the covenantors was to preserve the open, park-like appearance of Clemens Place, and provide for spacious lawns around the residences. If such was their intention, they employed no apt words to acomplish it. The mere recital of such a wish in the deed, though it might aid in the interpretation of the restrictions embodied in the deed concerning the sort of houses permitted, would not restrict the size of the houses. The only effects of the restrictions are to prescribe a building line, a minimum height for buildings, to exclude business and manufacturing from the district, and prohibit more than one dwelling on a lot. If those provisions are observed a proprietor may build a single residence to cover the full width of his lot. No dimension of the houses, except height, was prescribed, nor was a maximum size prescribed. The breach of the covenant by the defendants' building consists, not in covering too much of the lot, but in erecting more than one dwelling. No one would deny that Dixon, if he had desired to do so, might have built a residence of the exact dimensions and presenting the same outward appearance as the one in question, to be used exclusively by himself and family. By the same

token he can convert the building already erected into that kind of a house.

6. As the judgment in this case must be reversed, and as we have discerned in the oral testimony intimations that the restrictions in Clemens Place have lapsed, we think it proper to direct the court to investigate that question and plaintiffs' damages. If, in truth, the restrictions have lapsed, there is no cause to alter the building as it stands; for it might immediately be converted into flats without violating the covenant. When restrictions have expired courts refuse to order the removal of buildings which were erected in violation of them while they were in force. ,This is for the reason that another building like the one removed may be erected immediately. [Holt v. Fulshman, 74 N. Y. Supp. 894.] If the restrictions have lapsed, the plaintiffs may be entitled to redress for damages sustained from the construction and maintenance of the flats—redress which a court of equity would have power to award, as essential to complete justice, in the present case wherein the plaintiffs have shown an equity. But we shall not at present undertake to say what damages, if any, may be recovered. The judgment is reversed and the cause remanded. All concur.