# Richmond

## Florence H. Renn v. Edith Winslow Whitehurst, et als.

April 26, 1943.

Record No. 2620.

Present, Campbell, C. J., and Holt, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*William G. Maupin* and *H. B. G. Galt*, for the appellant.

*W. R. Ashburn*, for the appellees.

BROWNING, J., delivered the opinion of the court.

Mrs. Renn, who was a defendant in the trial court, acquired by purchase in 1933, from Bertha R. Barclay and husband, a lot, and residence thereon, at the town of Virginia Beach, which was a part of a subdivision called "Ubermeer", which was a development, by lots, streets and ways, with town conveniences, of a tract of land containing some 131 acres.

There were two maps or plats of this subdivision which were recorded in the appropriate deed books. The first was vacated by a deed of vacation of June 1914, but the second was retained and adhered to, as a muniment of title, and bears date, June, 1926.

When this land was subdivided it belonged to Mrs. Martha Miller Masury, having been conveyed to her in 1908, by her husband, John Miller Masury.

Mrs. Masury conveyed all of the lots in "Ubermeer", which had not been theretofore disposed of, to the McCaa Realty Corporation, which was a holding company, chartered at her instance, and she became the owner of all of its corporate stock. It thus appears that this transaction involved a transfer of record title from individual to corporate ownership without change in the beneficial ownership or identity of control. (Mrs. Masury's conveyance to the McCaa Corporation was dated February 27, 1928 and recorded February 28, 1928.)

The lot now owned by the appellant, Florence H. Renn, which is implicated here, is designated on the plat of "Ubermeer" as lot No. 14, in Block 4, and passed to the holding company under the above deed.

The McCaa Corporation, by charter amendment, became the Masury Corporation, which continued the plan of disposing of a selected portion of the lots composing the subdivision as highly restricted residential property.

The Masury Corporation conveyed the Renn lot to Bertha R. Barclay who, as has been indicated, was the immediate predecessor in title to Mrs. Renn. After the subdivision was developed, and became "Ubermeer", and while it was in the individual ownership of Mrs. Masury, she sold

and conveyed some twenty lots by deeds which contained ten uniform conditions and restrictions. The ones which are said to be concerned in this controversy are:

"4. That no house shall be erected or placed upon any building site until the plans showing all elevations shall have been submitted to and approved by Martha Miller Masury or duly authorized agents.

"5. That not more than one residence exclusive of out-buildings shall be allowed upon one lot.

"10. No double house, storehouse, factory building, duplex house or community house shall be erected or placed upon the property hereby conveyed, nor shall it be used for commercial or manufacturing purposes."

The deed from Mrs. Masury to the McCaa Corporation did not contain any of the restrictions, but as we have seen that transfer did not affect the actual ownership or control of the property.

On May 24, 1930, Mrs. Masury and her husband and the Masury Corporation, put upon record a declaration limiting the duration of all the restrictions, except one, to a period of 21 years from January 1, 1927.

Mention is made of this because if there were any question of notice to purchasers or transferees of lots, in whose deeds the restrictions were not incorporated in so many words, it would probably be met by the fact of the recordation of this declaration.

This, however, is not of importance, we think, because the original conveyance of the Renn property from Masury Corporation to Barclay contained the restrictions and the deed from the Barclays to Mrs. Renn referred to it and was made subject to such restrictions and conditions.

The lot of the appellee, Mrs. Whitehurst, was designated as lot 15 in Block 4. She was the successor in title to Charles E. Barco, who derived title from Mrs. Masury and husband by deed of February 3, 1928, which was recorded February 15, 1928, which contained the restrictions and conditions.

Not all of "Ubermeer" as platted was so developed and improved and disposed of as to compose a highly restricted residential area. Not all of it would lend itself to such amplification. Hence that portion which is north of 55th Street as shown on the map or plat which was recorded and which is a part of the record here, comprising Blocks 5 to 10 inclusive, was sold without restrictions, being unimproved and in its natural state.

Masury Corporation disposed of the developed property south of 55th Street, making 119 deeds conveying 178 lots. Of these, 114 deeds contain the precise conditions and restrictions as prescribed by Mrs. Masury in the deeds which she had theretofore made to individuals, five of the deeds have not the restrictions either for reasons already narrated or because of some occurrence peculiar to the particular lot or to the grantee which rendered the restrictions inappropriate. We have enumerated these things with rather prolix particularity because the appellant has seized upon certain of the incidents and emphasized them as tending to show that the restrictions were not of general application or that there was an hiatus or break in their presence in the chain of title which would indicate an abandonment in the absence of an insistence upon them.

The evidence is quite convincing that it was the intention of Mrs. Masury and her successors in title to preserve intact and enforce the restrictions which she had established and put into operation. That this was perfectly understood by the purchasers of lots is made plain by the fact that eight lot owners so testified and no lot owner, including the appellant and her husband, contended otherwise.

It is further contended that the deed from Masury Corporation to Bertha R. Barclay, Mrs. Renn's immediate predecessor in title, does not impress the property conveyed with the restrictions because the granting clause is complete without reference to them and that the subsequent language, "subject to the following conditions and restrictions", does not supply the omission or cure the alleged defect.

We cannot construe the plain language of the deed and obscure the manifest intention of the parties by the employment of a view so restricted.

To do so would be in the face of the evidence.

As to the second assignment of error we do not think there can be any misapprehension as to our view that it is without substantial merit.

As was aptly said by the appellee: "The testimony was overwhelming that the purpose of the plan was to establish a mutuality of covenant as to the developed property, based upon a contemplated mutual benefit between the developing corporation on the one part and its grantees and their successors in title on the other part."

The judicial trend of the day as well as the legislative inclination is to recognize and uphold the validity of such restrictions as are here present.

We are impressed with the soundness of the matter despite the able and ingenious contentions to the contrary. If we may divorce the expression from even the slightest intended odium the contentions seem quite abortive of their purpose.

Mrs. Renn conceived and effected the notion of converting her house into a double one for the announced purpose of leasing the enlarged quarters. This was thought by the appellees, as lot owners, and residents of "Ubermeer", to be a distinct violation of the restrictions quoted, hence their suit in equity to have the restrictions, as set forth in the bill, declared valid and enforceable and the violation thereof by the appellant abated. The trial court entered a decree in accordance with the prayer of the bill from which appeal was allowed.

The decree, we think, is eminently correct and it is in accord and harmony with the decisions of this and other courts of last resort.

In *Whitehurst* v. *Burgess*, 130 Va. 572, 578, 107 S. E. 630, this was said:

" 'All courts profess to give effect to the plain intention of the parties, in imposing such restrictions, and should

live up to their profession in good faith instead of seeking[7] ingenious subtleties of interpretation by which to evade such restrictions.' *Sanders* v. *Dixon*, 114 Mo. App. 229, 253, 89 S. W. 577, 584."

And also the following:

" 'We are to construe the language in accordance with the intention of the parties to the deed. In construing it, we should not assume that the restriction was inserted solely for the benefit of the grantor. The purpose of the restriction is not merely to benefit the grantor, but every owner of property and every resident on the street. Such a restriction assures purchasers that property will be devoted in a specified manner to residence purposes, and has a tendency to increase its value.' "

In *Springer* v. *Gaddy*, 172 Va. 533, 2 S. E. (2d) 355, the following quotation was adopted:

"In Northrup on the 'Law of Real Property,' page 377, it is said: 'A purely equitable doctrine, of great importance in growing cities and entirely distinct from the common law doctrine of covenants running with the land, has arisen in modern times. It is often referred to, from the English case that is its foundation, as the doctrine of *Tulk* v. *Moxhay*. It is also called the doctrine of restrictive covenants in equity, and the rights and obligations established by it are known as equitable easements and equitable servitudes. The doctrine is, in brief, that when, on a transfer of land, there is a covenant or even an informal contract or understanding that certain restrictions in the use of the land conveyed shall be observed, the restrictions will be enforced by equity, at the suit of the party or parties intended to be benefited thereby, against any subsequent owner of the land except a purchaser for value without notice of the agreement. The principal purposes of such agreements are to regulate the style and costs of buildings to be erected on a tract that is being sold in parcels for building lots, to restrict their location to certain distances from the street, and to prevent buildings in a locality from being put up or used for any other than residential purposes. Restrictive coven-

ants are most commonly made in connection with such sales of building lots, but the principle of the doctrine of *Tulk* v. *Moxhay* is, of course, applicable to other kinds of restrictions on the use of land, and equitable easements are created for many miscellaneous purposes.' "

We think the restrictions, as limited by the declaration of intention as to time of effectiveness, are reasonable in their scope and they form a general plan for the purpose of the maintenance of property values in the specific area and the enjoyment and utilization of the property in accordance therewith and that the whole scheme was apparent from the language used in its creation and that all subsequent property owners had notice of it. What we have said disposes of the assignments of error. The decree of the trial court is affirmed.

*Affirmed.*