## Richmond

### Donald A. Minner, Et Al. v. City of Lynchburg, Etc., Et Al.

March 4, 1963.

Record No. 5535.

Present, All the Justices.

The opinion states the case.

*Edward R. Feinman,* for the appellants.

*William Rosenberger, Jr.* (*C. Shepherd Nowlin, City Attorney,* on brief), for the appellees.

I'ANSON, J., delivered the opinion of the court.

This suit was instituted by the appellants, Donald A. Minner and others, owners of twenty-one lots in the Manton Wood subdivision in the city of Lynchburg, against Louise G. Raphael, Sidney A. Goodman, A. Leonard Goodman, and Fannie G. Ries, heirs of Emanuel Goodman, deceased, developers of the subdivision and hereinafter referred to as the Goodman heirs; the city of Lynchburg; John Stewart Walker, Inc., and George C. Walker, agents for the Goodman heirs; and George C. Walker, Ione McK. Walker, Gertrude Cook and Otto Cook, owners of real property adjacent to the subdivision; seeking to have the uniform restrictions contained in their deeds, or the deeds of their predecessors in title, and in all other deeds to lots in the subdivision declared binding upon lot 31, which is unsold and still owned by the Goodman heirs, and upon a 50-foot strip of lot 13, conveyed by the Goodman heirs to the city of Lynchburg for use as a public street to the adjoining property. They also sought injunctive relief against the city of Lynchburg and the owners of the adjacent property from the use of the 50-foot strip of lot 13.

The chancellor sustained demurrers filed by agents of the Goodman heirs and the owners of the property adjacent to Manton Wood

and the bill was dismissed as to them. They are not parties to this appeal. A demurrer filed by the city was overruled and it thereupon filed its answer to the appellants' bill of complaint.

The Goodman heirs, being non-residents, were duly proceeded against by an order of publication but they made no appearance in the court below or here.

After an *ore-tenus* hearing on the merits the chancellor held, in a written opinion, that the restrictions in appellants' deeds, or of their predecessors in title, and in the deeds to other lots in the sub-division were not binding on lot 31, which was retained by the Good-man heirs, and upon the 50-foot strip of lot 13 conveyed to the city of Lynchburg for use as a public street; that the deed to the city contained no restrictions against its use as a street and the city had neither actual nor constructive notice that it could not be so used; that the evidence showed that representations were made by an agent of the Goodman heirs to two purchasers of lots in the subdivision that no street would be opened across lot 13, but the representations were oral promises purporting to create an interest in real property and were not enforceable under the statute of frauds (§§ 11-1 and 11-2, Code of 1950, 1956 Replacement Volume; § 55-2, Code of 1950, 1959 Replacement Volume); and that to enjoin the city from constructing a street over the 50-foot strip would "be a futile thing * * * and benefit no one" because the city could condemn it for street purposes under its power of eminent domain.

From the decree dismissing appellants' bill and denying the injunction we granted appellants an appeal.

The appellants contend that the chancellor erred (1) in not holding that the Goodman heirs adopted a general plan or scheme of development of Manton Wood and that it was their intent to insert uniform restrictions in all their deeds of conveyance, which would be for the mutual benefit of all the owners of the lots in the subdivision, and that the purchaser of each lot acquired a right to have substantially the same uniform restrictions contained in his deed imposed upon all the lots retained by the Goodman heirs, or by a grantee from them who took title with notice, actual or constructive, of the general plan and the uniform restrictions; (2) in holding that the city of Lynchburg did not have actual or constructive notice of the general plan of development and of the uniform restrictions; (3) in holding that the statute of frauds barred them from the relief sought; and (4) in not enjoining the city of Lynchburg from constructing a street over the 50-foot strip of land.

On the other hand, the city says that the restrictions were limited to and applied only to the particular lot "hereby conveyed"; that they were for the sole benefit of the Goodman heirs; and that the oral promises of the agents of the common grantor were merely sales talk, made without authority, and were unenforceable under the statute of frauds.

In 1937 the Goodman heirs owned a tract of land containing approximately 25 acres bordering on Link road in the city of Lynchburg, which they, under the supervision of their agents, John Stewart Walker, Inc., and George C. Walker, subdivided into thirty-one residential lots, which subdivision they named "Manton Wood." A plat of the subdivision was recorded on August 14, 1937, and an amended plat, with only negligible changes, was recorded on May 11, 1938. Both plats showed a "Y" shaped street with the principal part designated as Manton drive. The arms of the "Y" connected with Link road, and Manton drive terminated at the base of the "Y" in a dead-end circle in front of lot 13. The street did not extend to any adjacent land, nor did the plats show provision for any future street to connect Manton drive to the adjoining land. There were three provisions written on these plats relating to building line restrictions only.

After recording the amended plat, the Goodman heirs proceeded to sell the lots and at the time this suit was instituted they had sold all except lot 31. With negligible exceptions in their first three deeds and the deed conveying to the city of Lynchburg the 50-foot strip reserved from lot 13, all the deeds from the Goodman heirs contained the uniform covenants and restrictions set out in their deed of July 18, 1940, to Irene J. Tucker, hereinafter referred to as the "Tucker restrictions."

The Tucker restrictions limited the use of the property conveyed to residential purposes and there were eight other provisions. The other restrictions and covenants here material are these:

"7. That no street, avenue, alley or thoroughfare of any sort to be used by the public shall be laid out through or upon any portion of the lot hereby conveyed.

\* \* \* \* \*

"9. That all of the covenants and agreements above expressed shall be held to run with and bind the real estate hereby conveyed and subsequent owners and occupants thereof until January 1, 1999, and the acceptance of this deed shall have the same force and binding

effect upon the party of the second part, her heirs, personal represent-atives and assigns, as if this deed was signed and sealed by the party of the second part, provided that any of the covenants, agreements and restrictions contained herein shall at any time and in any manner be changed with the mutual consent in writing of all of the owners of all of the lots shown upon the plat heretofore referred to."

When the lots were first offered for sale newspaper advertisements referred to Manton Wood as a "restricted community."

On December 3, 1941, the city of Lynchburg, holder of a lien on lot 18 in Manton Wood as security for the performance of a contract for the construction of two sewer mains in the subdivision, joined in a deed with the Goodman heirs, owners of lots, and others having liens on property in the subdivision to release a particular violation of the restriction against building more than one residence on each lot.

In a deed from the Goodman heirs dated April 9, 1943, releasing the requirement of submitting building plans and specifications for approval by their agent, which was required by the restrictions in the first deed conveying lot 9, it was stated that the provision was eliminated because they did not deem it any advantage to themselves or the subdivision.

In 1951 the city of Lynchburg, through its city manager, recog-nized that there was a possibility that the lands adjacent to Manton Wood would be developed and the interest of the city might be affected, and inquired of the city attorney whether Manton drive could be extended across lot 13 to the adjoining tracts of land.

In a letter dated February 9, 1951, addressed to the city manager, a copy of which was sent to the city's director of public works, the city attorney advised that there were no restrictions on the plats of Manton Wood which would prevent a street from being con-structed over any of the lots. He quoted restriction No. 7, and stated that although it had been placed in the deeds to all the lots sold, in his opinion it applied only to the lot conveyed in each deed and did not apply to any of the unsold lots, and that the proposed street could be placed entirely on lot 13 as it was still owned by the Goodman heirs.

The city attorney's letter did not mention the covenants and agreements contained in No. 9 of the Tucker restrictions, which appeared, with only negligible exceptions in the first three deeds, in all of the conveyances by the Goodman heirs.

On October 30, 1952, the Goodman heirs, by deed incorporating the Tucker restrictions, conveyed lot 13 to Frank B. Wright, Jr., but expressly reserved and excepted from said lot a strip 50 feet wide adjacent to lot 14 "with the right to use or dedicate said strip for a right of way into adjoining property or for any other purpose consistent with" the Tucker restrictions. Prior to this reservation twenty of the thirty-one lots in Manton Wood had been sold subject to the uniform restrictions.

On May 5, 1958, pursuant to an agreement between the Goodman heirs, the city of Lynchburg, and the owners of lands adjacent to Manton Wood, George C. Walker, et ux., and Gertrude Cook, et vir, the Goodman heirs conveyed to the city of Lynchburg the 50-foot strip of land reserved from lot 13. This 50-foot strip was to be used by the city for a street to connect with a strip of the same width across the lands of Cook into the lands of Walker. At the time of this conveyance twenty-six of the thirty-one lots in the subdivision had been conveyed subject to the uniform restrictions.

In early 1961 Walker submitted to the city planning commission a proposed plan for the development of his property which showed the use of the 50-foot strip of lot 13 as a through street from Manton drive. When this proposed plan to use the strip as a street was approved by the planning commission, and funds were appropriated by the city council for construction of the street, the appellants instituted this suit.

Seven lot owners in Manton Wood testified that when they were prospective purchasers the salesmen showed them a copy of the plat showing Manton drive as a dead-end street, told them that the restrictions to be placed in their deeds were binding on all the lots of the subdivision, and assured them that Manton drive would not become a public thoroughfare.

Walker testified that he may have expressed the opinion to two of the purchasers that Manton drive would remain dead-end but he gave them no assurances that a street would not be opened through any of the lots to connect Manton drive with adjacent properties; that it was the intention of the Goodman heirs to develop Manton Wood as a restricted residential subdivision and that the Tucker restrictions were inserted in the deeds of all thirty lots sold to enhance their value and to aid in making sales; and that Manton Wood had developed into a high class residential community.

The appellants argue that the plats, the restrictions, covenants and

agreements in their deeds, the newspaper advertisements, and the oral representations of the sales agents, show that it was the intention of the Goodman heirs to adopt a general scheme of development of Manton Wood for the mutual benefit of the Goodman heirs and all the grantees and that they acquired an implied equitable right to enforce the restrictions against all the lots as shown on the plats, including those retained by the common grantors or sold by them without restrictions where the grantee had notice of the uniform restrictions; and that the city of Lynchburg had actual and constructive notice of the restrictions, covenants and agreements and is bound by them even though they did not appear in its deed from the Goodman heirs. Thus they say that the opening of a street across lot 13 violates Nos. 7 and 9 of the Tucker restrictions and the chancellor erred in denying the injunction and dismissing their bill.

The appellants rely on the principle of implied restrictive covenants in equity which they say was adopted by this Court in the case of *Cheatham* v. *Taylor*, 148 Va. 26, 138 S. E. 545.

In the *Cheatham* case, Rivermont Company subdivided a large tract of land for development as a residential neighborhood. The recorded plat of the property did not show any building line restrictions, but the board of directors of the corporation passed a resolution declaring that all lots on Rivermont avenue within a certain area would have a building set-back line of 20 feet from the street, and that each deed of conveyance should contain a covenant to that effect. Newspaper advertisements for the sale of lots pointed out that there were building line restrictions on the Rivermont avenue lots. Cheatham and Taylor bought lots in the restricted area. Cheatham's deed and that of his predecessors in title contained the building line restriction and provided that the restriction was a covenant running with the land. Cheatham built a drug store 20 feet from the street, and later added 15 feet to the front of the store. In a suit brought by Taylor to require Cheatham to remove the addition, the lower court decreed that the restriction had been violated and ordered him to remove that portion of the building within 20 feet of the street line.

In denying an appeal from the decree of the trial court, this Court, in a written opinion, held that it was the intention of the parties that the restrictive provisions in the deeds were for the mutual benefit of the Rivermont Company and the purchasers of lots; that when the common grantor made the conveyances to the grantee's

predecessors in title there was an implied promise on its part, especially in view of the resolution of its board of directors, the provisions in the deeds stating that the restrictions were covenants running with the land, the newspaper advertisements, and the surrounding circumstances, that the entire property covered by the resolution would be subject to the restrictive covenants; and that for a violation of its promise it could be enjoined by a purchaser of one of the lots, because an equity attached to the lots sold which the common grantor could neither violate nor alienate to a purchaser with notice.

In the above case, 148 Va. at pp. 37, 38, 138 S. E. at p. 548, this Court quoted with approval the following from Northrup on the "Law of Real Property":

" 'A purely equitable doctrine, of great importance in growing cities and entirely distinct from the common law doctrine of covenants running with the land, has arisen in modern times. It is often referred to, from the English case that is its foundation, as the doctrine of *Tulk* v. *Moxhay* (2 Phillips 774). It is also called the *doctrine of restrictive covenants in equity*, and the rights and obligations established by it are known as *equitable easements* and *equitable servitudes*. The doctrine is, in brief, that when, on a transfer of land, there is a covenant or even an informal contract or understanding that certain restrictions in the use of the land conveyed shall be observed, the restrictions will be enforced by equity, at the suit of the party or parties intended to be benefited thereby, against any subsequent owner of the land except a purchaser for value without notice of the agreement.* * *' "

The above statement was also quoted in *Springer* v. *Gaddy*, 172 Va. 533, 540, 2 S. E. 2d 355, 358, and *Renn* v. *Whitehurst*, 181 Va. 360, 366, 367, 25 S. E. 2d 276, 278, 279.

While *Cheatham* v. *Taylor, supra, Springer* v. *Gaddy, supra*, and *Renn* v. *Whitehurst, supra*, are all distinguishable on the facts from the present case, the doctrine of implied restrictive covenants in equity was recognized as a well-settled principle and it is applicable in the present case.

Although there are no Virginia cases dealing with precisely the same factual situations as in the present case, it may be safely said that the intent of the common grantor in imposing restrictions in such cases is an essential factor. *Cheatham* v. *Taylor, supra; Springer* v. *Gaddy, supra; Renn* v. *Whitehurst, supra; Whitehurst* v. *Burgess*, 130 Va. 572, 107 S. E. 630; *Stevenson* v. *Spivey*, 132 Va. 115, 110 S. E. 367, 21 A. L. R. 1276.

While the burden of proof is on one claiming the benefit of an implied restrictive covenant, if the "uniform scheme of development or improvement is proved to have been the intention of the parties, equity will carry it out at the suit of any of the lot holders; provided, of course, he has not by his own conduct shut the doors of the court," and if the party against whom the restrictions are sought to be enforced had notice, actual or constructive, of the restrictions, conditions and covenants, even though they were not contained in his deed. *Stevenson* v. *Spivey, supra,* 132 Va. at pp. 119, 121, 110 S. E. at pp. 368, 369, 21 A. L. R. 1276; *Cheatham* v. *Taylor, supra.*

It is generally held that where a common grantor develops a tract of land for sale in lots and pursues a course of conduct which indicates that he intends to inaugurate a general scheme or plan of improvement for the benefit of himself and the purchasers of the various lots, and by numerous conveyances inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property, the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude, to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions and covenants. *Sanborn* v. *McLean,* 233 Mich. 227, 206 N. W. 496, 60 A. L. R. 1212; *Denhardt* v. *De Roo,* 295 Mich. 223, 294 N. W. 163; *Turner* v. *Brocato,* 206 Md. 336, 111 A. 2d 855; *Grange* v. *Korff,* 248 Iowa 118, 79 N. W. 2d 743; *Waterhouse* v. *Capital Investment Co.,* 44 Haw. 235, 289, 311, 353 P. 2d 1007, 1014; 26 C. J. S., Deeds, § 167(1), pp. 1143, 1144; 14 Am. Jur., Covenants, Conditions and Restrictions, §§ 199, 200, 319, pp. 612, 613, 656, 657; Annotations: 60 A. L. R. 1216, 144 A. L. R. 916, and 4 A. L. R. 2d 1364, 1366.

Where it is provided in deeds conveying lots in a subdivision that restrictions can only be waived by a specific number of lot owners, it shows an intention on the part. of the common grantor to create a general scheme of development for the mutual benefit of all of the lot owners and not solely for his own benefit. *Armstrong* v. *Leverone,* 105 Conn. 464, 136 A. 71, 74; 26 C. J. S., Deeds, § 167(2), p. 1151.

In the instant case the deeds to all land in the subdivision conveyed by the Goodman heirs, except that to the 50-foot strip reserved from lot 13 which was conveyed to the city for the construction

of a street, contain a restriction that no street shall be laid out through or upon the lot conveyed. Restriction No. 9 provides that all the restrictions imposed on the land conveyed *"shall be held to run with and bind the real estate * * * and subsequent owners * * * thereof,"* their heirs and assigns, until January 1, 1999; and further, provides that any of the covenants, agreements and restrictions contained therein could *"at any time and in any manner be changed with the mutual consent in writing of all the owners of all the lots shown upon the plat heretofore referred to."* (Italics supplied.)

In *Connor* v. *Hendrix*, 194 Va. 17, 25, 26, 72 S. E. 2d 259, 265, we quoted with approval the following:

"It is a well-settled rule of construction that inasmuch as the parties must have intended all the provisions and terms of a deed to have some meaning and be given some import, from the fact that the terms and provisions were actually inserted in the deed, a deed will be so interpreted as to make it operative and effective in all its provisions, if its terms are susceptible of such interpretation. Every word, if possible, is to have effect, for, it has been said, the deed, as the witness to the contract between the parties, should speak the truth, the whole truth, and nothing but the truth."

Without giving any effect to the oral representations of the agents of the Goodman heirs, which are of doubtful weight when considered in the light of the statute of frauds (see Annotation, 5 A. L. R. 2d 1316, 1321-1345) since an equitable servitude or easement is an interest in land (*Springer* v. *Gaddy, supra; Cheatham* v. *Taylor, supra*), the language of restriction No. 9, coupled with the insertion of the uniform restrictions in all the deeds to the lots sold, shows that it was the intent of the Goodman heirs to create a scheme of development for the mutual benefit of themselves and the owners of all the lots shown on the plats, and there was an implied reciprocal covenant that the restrictions would apply not just to the lots sold but to all the land retained by them and would be binding on their grantees with notice. Although the Goodman heirs were the owners of all the unsold lots, changes in the restrictions could not be made on any of the lots at any time unless all of the owners of all of the lots shown on the plats joined in a deed releasing or changing them. No other construction can be placed on the language used in restriction No. 9. Since restriction No. 9 does not give the Goodman heirs alone the right to change the restrictions, it negates the contention that the restrictions were solely for the benefit of the grantors and

supports the conclusion that they were for the mutual benefit of the common grantors and the grantees. An equity attached to all the unsold lots which the Goodman heirs could neither violate nor negate by alienation to a purchaser with notice. Thus the conveyance of the 50-foot strip to the city without restrictions violated the implied reciprocal covenant with the owners of lots in the subdivision. Even though the deed to the city did not contain restriction No. 7, the 50-foot strip was impressed with the restriction against the construction of a street if the city had notice.

The next question is whether the city had either actual or constructive notice of the restrictions, covenants and conditions. The evidence shows that the city did have both actual and constructive notice. In 1951 the city attorney of the city of Lynchburg advised the city manager and the director of public works that there was a restriction in all of the deeds to the lots that had been conveyed by the Goodman heirs prohibiting the construction of a street across any of the lots conveyed.

Moreover, on December 3, 1941, the city, having a lien on lot 18 in the subdivision, joined in a deed of release of a violation of a restriction.

The deed from the Goodman heirs to Frank B. Wright, Jr., conveying lot 13, dated November 9, 1952, conveyed subject to the Tucker restrictions and reserving the 50-foot strip across lot 13, was in the city's chain of title, thereby giving it constructive notice of the restrictions and covenants. See Annotation, 4 A. L. R. 2d, 1364, 1371-1373, and the cases there cited.

We do not agree with the argument of the city that the language "hereby conveyed," used in the restrictions, shows an intent to limit the restrictions and covenants to the particular lot conveyed in the light of other language used in restriction No. 9 and the insertion of the uniform restrictions in all the deeds except the one to the city.

We hold that it was the intention of the Goodman heirs to create a general scheme of development; that the Tucker restrictions were for the mutual benefit of the Goodman heirs, their grantees and successors in title; and that all the owners of the lots shown on the plats of Manton Wood acquired an implied reciprocal negative easement in all the lots in the subdivision, including lot 31 retained by the Goodman heirs, and all except Frank B. Wright, Jr., whose deed reserved the 50-foot strip for street purposes, have the right to enforce restriction No. 7 against the city of Lynchburg, which acquired the

50-foot strip with actual and constructive notice of the restrictions and covenants. Thus the chancellor erred in dismissing the appellants' bill of complaint and not enjoining the city from constructing a public street across the 50-foot strip of lot 13.

This does not mean, however, that the city cannot construct the street across the 50-foot strip. It may acquire this right by eminent domain (Code §§ 25-232 and 25-8), but subject to the protection of § 58 of the Constitution of Virginia that the equitable rights of the appellants, except Frank B. Wright, Jr., and all the other owners of lots may not be taken or damaged for public use without just compensation. *Meagher* v. *Appalachian Power Co.*, 195 Va. 138, 146, 77 S. E. 2d 461, 465, 466.

The decree of the lower court is reversed, and the chancellor is hereby directed to reinstate the cause and enter his decree in accordance with the opinion of this Court and to enjoin and restrain the city of Lynchburg from constructing a street across the 50-foot strip of lot 13 in the Manton Wood subdivision.

*Decree reversed and*
*remanded with directions.*