In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-20-00036-CV
_____

**RIVER PLANTATION COMMUNITY IMPROVEMENT ASSOCIATION, Appellant**

**V.**

**RIVER PLANTATION PROPERTIES LLC AND PREISLER GOLF PROPERTIES LLC, Appellees**

**On Appeal from the 284th District Court**
**Montgomery County, Texas**
**Trial Cause No. 17-07-08266-CV**

### OPINION

An ancient philosopher once said: "[N]othing is permanent except change."[1]

This case is about change, and the effort by a property owners' association to stop

it. The property owners' association, River Plantation Community Improvement

---

[1]https://www.brainyquote.com/quotes/heraclitus_165537 (last checked April 7, 2022).

Association, sued and lost in a summary-judgment proceeding its quest to prevent property, formerly used as a golf course, from being developed into single-family residential housing. So, although we too are golfers, we too must follow Texas law that places every property owner on constructive notice of every recital in every document in the instruments that are in their chains of title. For the reason explained below, the trial court did not err in refusing the Association's request asking the court to declare the defendants' property permanently restricted to a recreational use like golf.

Background

The dispute arose over three large tracts of property in the River Plantation subdivision in Montgomery County. The Association sued and claimed the tracts owned by River Plantation Properties LLC (Properties) and Preisler Golf Properties LLC (Preisler)—tracts containing three nine-hole golf courses known as the Augusta, Biloxi, and Charleston courses—are burdened by an implied-negative-reciprocal easement. In layman's terms, this easement—when the facts show it exists—restricts a developer from using the property the developer owns in the subdivision in ways inconsistent with the uniform plan the developer created for the subdivision. After the Association sued, Properties and later Preisler moved for summary judgment, asserting that as a matter of law no implied-negative-reciprocal easement exists burdening or restricting the manner they may use the property they

2

own that lies in areas designated on plat maps for the subdivision section as Reserves.

To meet their summary-judgment burden, Properties and Preisler relied on the plat maps, deeds and restrictions filed of record in the official property records of Montgomery Country for the River Plantation subdivision. The summary-judgment evidence they attached to their motions proves that in 1963, River Plantation Development Company, Inc. (RP Development) filed the initial plat for the first of several sections of the subdivision, which has grown over the past fifty years into multiple platted sections of the River Plantation subdivision. Over the next several decades, Walter M. Mischer Co. (Mischer) filed other plat maps for other sections of River Planation.[2] All the recorded maps the developers filed show large areas of the subdivision were planned for use as single-family residential lots. That said, the maps in five sections of the River Plantation subdivision show areas marked on the maps filed by RP Development and Mischer as "Reserves." The deeds through which RP Development and Mischer acquired their interests in the property now at issue (tracts now owned by Properties and Preisler) are also in the summary judgment and appellate record. Nothing in the deeds or the maps filed of record

---

[2]Mischer bought the land it owned in the subdivision from RP Development in 1966, with RP Development retaining a section of River Planation while also retaining a portion of the Reserves.

include language to indicate the areas identified as Reserves are restricted to any particular category of use, such as recreation, or for any specific use, like golf.

Over the years that RP Development and Mischer owned and used the Reserves, they used the Reserves to build a clubhouse, three nine-hole golf courses, and tennis courts.[3] In the past, the golf course operations in the subdivision consisted of three nine-hole courses, the Augusta, the Biloxi, and the Charleston courses. But in 2018, the Charleston course was closed. Now, the operations of the golf courses involve the Augusta and the Biloxi courses and the clubhouse.[4]

Upon learning Properties was planning to sell the Charleston course to a developer who was planning to repurpose the course to build single-family residences, the Association sued Properties and asked the trial court to issue a declaratory judgment. In the suit, the Association alleged that RP Development and Mischer, who developed the subdivision, created the subdivision using a common plan and scheme designed to enhance the subdivision's value, beauty, and design of the subdivision for the mutual benefit of the developers and those who bought lots there. According to the Association, a restriction limiting the Reserves to golf should

---

[3]It is not clear from the summary-judgment record about which entity, RP Development or Mischer, built the clubhouse, the tennis courts, the swimming pool, or the order in which the three nine-hole golf courses were built.

[4]The record does not show whether the tennis courts and swimming pool are still being operated somewhere in the area designated on the plat maps as Reserves.

4

be implied as to the Reserves because: (1) many homeowners had purchased homes in the subdivision after being told the subdivision offered a country-club lifestyle; (2) one section in the subdivision has around sixty lots labeled on maps as "golf course lots;" (3) two sections in the subdivision have several lots with setback restrictions consistent with the restrictions like those appliable to "golf course lots;" and (4) in 1977, Plantation Management Company, acquired an area of the Reserves that covered most and possibly all of the Charleston course from RP Development. After acquiring part of the Reserves, Plantation Management filed a declaration of restrictions as to the portion of the Reserves it acquired that restricted its right to use the property to "the operation of golf and tennis facilities and ancillary uses related thereto" for eleven years.[5]

In the suit, the Association asked the trial court to declare an implied-negative-reciprocal easement exists on the current owners of the areas historically used in the subdivision for golf because the original developers of the subdivision had employed a common plan and scheme when developing and selling the lots they platted in the subdivision. The Association asked the trial court to permanently restrict Properties

---

[5]The deed from RP Development to River Plantation Management contains a reverter clause that restricts River Plantation Management's right to use the property, the Reserves, to the restrictions consistent with the ones we have quoted above. No one argues that RP Development exercised the reverter clause in the deed used to assign the property to River Planation Management. Moreover, the reverter clause expired in 1988, more than three decades before the Association filed this suit.

from developing or using the golf courses in River Planation from being used in any manner inconsistent with golf.

In January 2019, the Association amended its petition and named Preisler Golf Properties LLC as a defendant. In the amended petition, the Association alleged that Preisler owns the Augusta and Biloxi courses and the clubhouse. The Association alleged that Preisler disputes "there is any implied restriction on the land such that its use could be converted to non-golf course use at any time or sold to a buyer who would have no intention to use the land as a golf course and instead would use the land for any purpose." The amended petition asked the trial court to declare an implied-negative-reciprocal easement exists, restricting Properties and Preisler from using the golf courses in a manner inconsistent with golf "and related amenities such as the country club."

In March 2019, Properties filed a traditional motion for summary judgment on the Association's declaratory judgment claims.[6] In its motion, Properties traced the history of River Plantation, the history of the golf courses, and tied those histories to the legal instruments filed of record in Montgomery County. Based on the information in Montgomery County's official property records, Properties argued

---

[6]The motion we discuss in the appeal is Properties' amended motion, but the amended motion is the live motion at issue in the appeal. The record shows that Properties moved for summary judgment nearly eighteen months before filing the amended motion, but that motion was never heard.

no restrictions exist on the rights Properties has to repurpose the Charleston course or sell the tract it owns in the Reserves so that a developer may subdivide the tract into lots and build single-family residences there. Properties attached around 250 pages of records consisting of deeds, plat maps and restrictions of record on file in Montgomery County pertaining to the River Planation subdivision to support its motion.

In the response to the motion, the Association relied on the same records to argue that when RP Development and Mischer created River Plantation they had created a uniform plan of development by subdividing the lots to create a country-club lifestyle for the mutual benefit of the developers and for those who bought lots and built homes in the River Plantation subdivision. To support its claim asking the court to declare that an implied-negative-reciprocal easement existed on the Reserves, the Association pointed to (1) the plat maps and restrictions of record, noting the references in the maps and restrictions that refer to a "golf course," "golf course lots," and plat maps, which the Association argues depicts fairways, tee boxes and greens; (2) summary-judgment evidence consisting of marketing and advertising materials, dated in the late '60s and early 70's that marketed the subdivision as a golf-course and country-club community; and (3) an affidavit from George D. Gordon, a resident of River Plantation who bought his home in 1974. In the affidavit, Gordon swore he relied on representations by his realtor that the subdivision would

7

be a "golf course community or subdivision" when he was deciding to buy the home. According to Gordon, he would not have bought the home had he known the developers were not obligated to continue using their tracts for golf.

In May 2019, the trial court signed an interlocutory order and ruled that, as a matter of law, no implied-negative-reciprocal easement existed requiring Properties to use the tracts it owns in River Planation in the Reserves as a golf course, country club, or for a recreational use. Less than two weeks later, the trial court amended its interlocutory summary-judgment order after determining its earlier order inadvertently included land Properties had sold and no longer owned—that is, land owned by Preisler since July 2018. The trial court vacated its earlier interlocutory summary-judgment order and signed an another one, which grants Properties' motion for summary judgment "ONLY AS TO [PLANTATION'S] REMAINING LAND."[7] The interlocutory order declares Plantation is free to use its remaining land "free of any use restriction or encumbrance by way of an implied-negative-reciprocal easement that limits the use of the said property as a golf course, country club, recreational area, or in any other manner."

_____

[7]As we understand the amended order, the remaining land is the area in River Planation formerly used as the nine-hole Charleston course. It need not be said that when it comes to land, the better practice would be for a court's orders to describe the property affected by the order more clearly than the description used in the interlocutory order.

Just three weeks later, Preisler filed its own traditional motion for summary judgment. Much like Properties, Preisler asked the trial court to declare "its property is *not* subject to any restrictions in favor of the Association, its members or the public." Preisler used the same evidence the Association used to support its motion for summary judgment, meaning the same deeds and plats filed of record for the subdivision , which trace the history of the subdivision and the golf courses that are in it. Along with the certified copies of the property records for the subdivision, Preisler supported its motion with an affidavit from David Preisler. David Preisler swore that in July 2018, Preisler acquired the Augusta course, the Biloxi course, and the clubhouse from Properties by special warranty deed.

In June 2019, the trial court conducted a hearing on Preisler's motion and then granted Preisler's motion for summary judgment. Once again, the trial court found that no implied-negative-reciprocal easement existed on the property owned by Preisler in the Reserves in the River Plantation subdivision. For that reason, nothing required Preisler to use those tracts in the subdivision as golf courses, for a country club, or to devote tracts to a recreational use. That said, the summary-judgment orders at this point remained interlocutory since none of them addressed the

counterclaims Properties and Preisler filed against the Association to recover attorney's fees.[8]

In December 2019, the trial court conducted an evidentiary hearing to decide whether to award attorney's fees. Four witnesses testified in the hearing on fees: (1) Jamie Goodman, the president of the Association; (2) George Gordon, a homeowner who has lived in River Plantation since 1974; (3) Ed Blackburne, a homeowner who has lived in River Plantation since 1986; and (4) David Preisler, the president of Preisler Golf Properties LLC. Following the hearing, the trial court signed a final judgment and found "it would be neither equitable nor just to award attorney's fees" to any of the parties. After that, the Association filed an appeal.[9]

On appeal, the Association raises two issues. First, it argues the summary-judgment evidence reveals an issue of material fact remains about whether an implied-negative-reciprocal easement exists on the tracts now owned by Properties and Preisler restricting their respective rights to use their tracts for any purpose but for golf. Second, the Association argues it is entitled to another hearing on whether

---

[8]*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (providing that in any proceeding under the Declaratory Judgment Act, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just").

[9]The River Plantation Municipal Utility District was at one time a party to this appeal. The Utility District was an intervenor in the suit, but while the appeal was pending, the Utility District informed the Court that it had settled its claims. After announcing its settlement, the Utility District filed an unopposed motion to dismiss, a motion the Court granted.

it has a right to be awarded attorney's fees on its claim for fees. According to the Association, the trial court erred on its declaratory judgment claim against Properties and Preisler by failing to allow a jury to decide what amount to award in fees before deciding whether an award of fees would be equitable and just. The Association also argues that as to its fees, the trial court erred in refusing to admit evidence it offered during the hearing on attorney's fees to show that the fees the Association incurred were reasonable in amount and necessary for the services that were performed by the Association's attorney.[10]

Analysis

*Standard of Review*

In its final order, the trial court declared that no implied-negative-reciprocal easement burdened the tracts owned by Properties and Preisler in the River Plantation subdivision restricting their respective rights to use their tracts to golf, to using the tracts for a country club, or to using them for a recreational use. On appeal, we review rulings granting summary judgments de novo, "taking as true all evidence favorable to the nonmovant, and indulging every reasonable inference and resolving

---

[10]*See* Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (allowing a trial court to award costs and attorney's fees on a claim for declaratory judgment if the fees are "reasonable and necessary" and "equitable and just").

11

any doubts in the nonmovant's favor."[11] To prevail on a traditional motion for summary judgment, the party that filed the motion must demonstrate "that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in any answer or any other response."[12] If the defendant conclusively negates a single essential element of the plaintiff's cause of action, or the defendant conclusively establishes an affirmative defense, the defendant is entitled to summary judgment on that claim.[13] By definition, if evidence is conclusive on a question, it may be viewed in only one way, so only one conclusion is possible from evidence that is conclusive.[14] At issue in the trial court and in the appeal is whether a fact issue exists based on the evidence the Association relies on to claim that the tracts in the subdivision now owned by Properties and Preisler are restricted by an implied easement restricting Properties' and Preisler's tracts in River Planation to a recreational purpose like golf.

When a party that filed a traditional motion for summary judgment attaches summary-judgment proof sufficient to establish no issue of material fact exists on at

---

[11]*Barbara Techs. Corp. v. State Farm Lloyds*, 589 S.W.3d 806, 811 (2019); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).
[12]Tex. R. Civ. P. 166a(c).
[13]*Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508-09 (Tex. 2010).
[14]*City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005).

least one element of the plaintiff's claim, "the burden shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment" on the claim.[15] Besides complaining about whether the trial court correctly granted the motions for summary judgment, the Association complains that the trial court erred in excluding some of its summary-judgment evidence, meaning the evidence the Association offered to prove its fees were reasonable, necessary, equitable, and just. We review a trial court's ruling excluding evidence for abuse of discretion.[16] In determining whether an abuse of discretion occurred, we consider whether the trial court excluded evidence without reference to the guiding rules and principles that apply to recovering attorney's fees on a claim filed under the Uniform Declaratory Judgments Act.[17]

*Application*

A. Is there an implied easement?

First, we turn to the Association's argument claiming the trial court erred in finding no implied-negative-reciprocal easement existed on the tracts Properties and Preisler own in the River Plantation subdivision. In 1969, for the first time, the Texas

---

[15]*Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 84 (Tex. 2018).

[16]*See Starwood Mgmt., LLC v. Swaim*, 530 S.W.3d 673, 678 (Tex. 2017).

[17]*Id*. (quoting *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)); Tex. Civ. Prac. & Rem. Code Ann. § 37.002(a) (providing "[t]his chapter may be cited as the Unform Declaratory Judgments Act").

13

Supreme Court recognized that the implied-negative-reciprocal easement doctrine existed under Texas law—a doctrine we refer to in the opinion either as the reciprocal-easement doctrine or as a reciprocal-easement claim.[18] Twenty-one years later, the Texas Supreme Court explained the reciprocal-easement doctrine

> applies when an owner of real property subdivides it into lots and sells a substantial number of those lots with restrictive covenants designed to further the owner's general plan or scheme of development. The central issue is usually the existence of a general plan of development. The lots retained by the owner, or lots sold by the owner from the development without express restrictions to a grantee with notice of the restrictions in the other deeds, are burdened with what is variously called an implied reciprocal negative easement, or an implied equitable servitude, or negative implied restrictive covenant, that they may not be used in violation of the restrictive covenants burdening the lots sold with the express restrictions.[19]

In *Evans*, the Texas Supreme Court explained that when a plaintiff seeks to enforce a reciprocal-easement claim against the grantor of the property (or the grantor's successor), the plaintiff must prove that both the plaintiff's and defendant's tracts are

- traceable to a common developer,
- who developed a tract of land for sale in lots,
- who pursued a general plan or scheme to develop the land,
- for the benefit of himself and the purchasers of the various lots, and

---

[18]*MacDonald v. Painter*, 441 S.W.2d 179, 183-84 (Tex. 1969) (holding that no covenant may be implied from filing a map depicting residential lots when neither the deeds or the map dedicating the lots restricted the owners from subdividing their lots into additional lots).

[19]*Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990).

14

- by numerous conveyances, when selling the lots, the developer inserted in the deeds substantially uniform restrictions, conditions, and covenants against the use of the property.[20]

The Association argues the recorded plats, deeds, and restrictions of record for the River Planation subdivision show that RP Development and Mischer used a common plan and scheme in developing the subdivision and developed it as a golf-course community. The Association argues the golf-course restriction they claim applies to Properties' and Preisler's tracts arose from (1) express restrictions imposed on the lots in the River Plantation subdivision by RP Development and Mischer, (2) advertisements and representations the developers made to those who bought homes in the sixties and seventies in the subdivision, and (3) the plat maps and restrictions, filed of record, which gave those purchasing lots in the subdivision actual or constructive notice that RP Development and Mischer had a common plan and scheme to develop the subdivision as a golf-course community.

But the problem for the Association is that the plat map and Declaration of Restrictions, which RP Development filed in 1964 when it dedicated the initial section of the subdivision, reflects that RP Development expressly excepted the Reserves from the uniform plan that applies to the lots shown in the map.[21] The plat

_____

[20]*See id.* (citing *Minner v. City of Lynchburg*, 204 Va. 180, 129 S.E.2d 673, 679 (1963)).

[21]The restrictions filed by RP Development in 1964, which was before RP Development sold any of the land it owned in the subdivision to Mischer, contains

15

maps for the sections of the subdivision later developed by Mischer followed the same pattern. As to Mischer, the summary-judgment evidence shows that in 1966, Mischer purchased property in River Plantation from RP Development. Yet nothing in Mischer's deed from RP Development required Mischer to use the property it bought from RP Development, including the tracts it purchased in the Reserves, for any specific or general recreational purposes including golf. And nothing in the deed restricts or limits Mischer from selling the Reserves or subdividing the Reserves into additional lots and then developing those tracts for single-family residences. In 1967, Mischer filed a plat to develop the first of the sections in the River Plantation subdivision that it developed. When Mischer recorded restrictions for the sections it developed bordering the Reserves, it excluded the Reserves from the uniform plan that applies to the lots in the subdivision.[22] Stated another way, when the

---

twenty-three separately numbered paragraphs and an introductory paragraph that is not numbered. The initial unnumbered paragraph includes language that excepts the Reserves from the uniform plan that RP Development created for developing River Plantation. RP Development accomplished that by using the following language: "[RP Development], a Texas Corporation, being the owner of that certain subdivision known as River Plantation, . . . and desiring to create and carry out a uniform plan for the improvement, development and sale of all the numbered lots (excluding the Reserves shown) in River Plantation, Section One, . . , does hereby adopt and establish the following reservations, restrictions, covenants and easement to apply uniformly in the use, occupancy and conveyance of all such numbered lots in River Plantation, Section One, . . . ."

[22]The restrictions Mischer filed in 1967 consists of twenty-three numbered paragraphs. The initial paragraph in the restrictions, which is not numbered, includes language excepting the Reserves from the uniform plan that Mischer developed for

homeowners living in the subdivision (the present and former members of the Association) bought their lots, the plats for River Plantation, they were on constructive notice of the recitals in in official property records maintained in Montgomery County, recitals that show RP Development and Mischer both excluded the Reserves from the uniform plan that applies to the lots. And those who purchased lots were also on constructive notice that RP Development and Mischer had not restricted their own rights as to how they could use the Reserves. For example, nothing in the deeds, maps, or deed restrictions restricted RP Development or Mischer from using their tracts in the Reserves to swimming, tennis or golf, and nothing in these instruments filed of record devoted the Reserves to a general recreational use.

So prospective purchasers of homes in River Plantation, looking at the recitals in the chain of title to their lots, were on constructive notices that RP Development and Mischer were not restricted to using the Reserves for a specific purpose like golf

---

the subdivision. Mischer did that by using the following language: "[Mischer], a Texas Corporation, being the owner of that certain subdivision known as River Plantation, Section Two, . . . , desiring to create and carry out a uniform plan for the improvement, development and sale of all the numbered lots (excluding the Reserves shown) in River Plantation, Section Two, . . . do[es] hereby adopt and establish the following reservations, restrictions, covenants and easement to apply uniformly in the use, occupancy and conveyance of all such numbered lots in River Plantation, Section Two . . . ." Other sections that Mischer developed in River Plantation, which also border the Reserves, contain the same language excluding the Reserves from the uniform plan.

17

or from further subdividing the Reserves into lots for single-family residences. The Association asked the trial court to imply that a restriction existed on Properties' and Preisler's tracts. However, the Association then never explained to the trial court and has not explained to this Court why a factfinder could reasonably imply a restriction when the legal instruments to the tracts, filed of record, exclude the Reserves from the uniform plan created by the developers in River Plantation. Here, the plats and subdivision restrictions are in the summary-judgment evidence. They show that RP Development and Mischer never intended to include the Reserves in the uniform plan created for the lots being developed in the subdivision, the lots that are currently owned by members of the Association.

When Properties and Preisler moved for summary judgment, and when Properties and Preisler responded to the brief the Association filed here, both pointed to the language in the dedicatory instruments filed in Montgomery County's property records excluding the Reserves from the subdivision's uniform plan.[23] But the Association ignores that language in its brief and never explains why a reasonable factfinder could have ignored that language in the instruments RP

---

[23]Properties and Preisler attached certified copies of the relevant documents tracing the properties they own to the original developers of the subdivision, RP Development and Mischer.

18

Development and Mischer filed of record when relying on what tracts were included in the subdivision's uniform plan.

Of course, we recognize that when developing tracts of land for sale, developers may by their conduct create an equitable servitude by creating a uniform plan of development when they sell lots without having given prospective purchasers notice that the developers are reserving land for themselves that has been excluded from the subdivision's uniform plan.[24] But that's not what happened here. When courts have applied the reciprocal-easement doctrine, they have done so on facts proven at trial that showed the purchasers were given no actual or constructive notice of the fact the developer's property was not include in the subdivision's uniform plan.[25] So unlike *Evans*, the case the Association relies on, the plat maps and subdivision restrictions for River Plantation, documents in the official property record files of Montgomery County, include recitals that placed the owners of lots in River Plantation on notice of the fact that the Reserves in River Plantation were excluded from the subdivision's uniform plan. And the recitals of record notified prospective purchasers including those who are members of the Association that RP

---

[24]*See Evans*, 796 S.W.2d at 466.
[25]*Id*. at 466-69.

Development and Mischer kept the Reserves (without restricting or limiting the use of the Reserves) for themselves.[26]

The Association's remaining summary-judgment evidence fails to create a fact issue on its reciprocal-easement claim. The advertisements for River Plantation, placed in a Conroe newspaper in the mid-60's and early 70's, the advertisements placed in Conroe High School's yearbook in the late 60's and early 70's, and the affidavit of George Gordon, who bought a home in River Plantation in 1974, all fail to show that the tracts owned by Properties and Preisler are burdened by an implied easement restricting their rights to use the tracts to a recreational use like golf.

First, we will discuss the information in the ads. In general, the ads were placed by someone who chose to advertise River Plantation as a place where there were tennis courts, Olympic outdoor pools, outstanding school districts, and that had

---

[26]*See* Tex. Prop. Code Ann. § 13.002(1) ("An instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument[.]"); *Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 908 (Tex.1982) (explaining that a purchaser of real property "is bound by *every* recital, reference and reservation contained in or fairly disclosed by any instrument which forms an essential link in the chain of title under which he claims"); *see also Adams v. Rowles*, 228 S.W.2d 849, 853 (Tex.1950) (noting in a trespass to try title action that the respondent's chain of title showed the respondent held title to his land with reference to a dedicatory plat duly recording a valid public road, so since the dedication was in the respondent's chain of title, the respondent was charged with knowledge of its existence  and "took his land burdened with the roadway").

property taxes of just two-thirds of that on properties in Houston.[27] In the 1971 Conroe High School yearbook, River Plantation is advertised as a subdivision just "35 minutes from downtown Houston on [the] Dallas Freeway (Interstate 45) just past the San Jacinto River[.]" Even though the summary judgment does not reveal whether RP Development, Mischer, or whether another entity created and placed the ad, we doubt the ads were intended to imply that the subdivision would never change. Stated another way, the ads, when viewed reasonably, cannot have been intended to imply that traffic patterns between Conroe and Houston in 1971 would remain 35 minutes forever. Instead, the ads about the commute, the tennis courts, the swimming pools, the schools, and the golf course do nothing more than inform potential buyers about the advantages of living in the subdivision on dates contemporaneous with those the ads were placed. Nothing in the ads represent that River Plantation was designed or planned as a community with recreational opportunities the developers permanently dedicated to recreation, including recreational uses like swimming, tennis, and golf.

George Gordon's affidavit doesn't raise a fact issue either on the Association's claims. According to Gordon, he saw sales brochures for River

---

[27]The summary-judgment evidence does not show whether the ads were placed in the newspaper or annual by RP Development, by Mischer, by a homebuilder, or by a realtor.

Plantation in the early 70's when he was looking for a home. River Plantation, Gordon explained, was advertised as a golf course and country club community. Gordon swore that in the 70's, the subdivision had a twenty-seven-hole course. While Gordon said that at first, he considered building a home in another section of the subdivision, he decided to buy an existing home in section five of the subdivision in 1974, a section which, when he bought the house, had holes of a golf course in the section. Gordon still lives in his same home today. While Gordon swore his realtor told him the subdivision would stay a golf-course community, he never revealed the realtor's name or the name of his realtor's employer. Gordon never claimed the realtor worked for or was an agent of Mischer, which the other summary-judgment evidence shows is the entity responsible for developing section five.

As to section five, the summary-judgment evidence shows that in 1969, Mischer dedicated section five by filing a deed for that section of the subdivision. The deed creates a uniform plan, which applies to the lots in section five. The deed, however, excludes the Reserves from the uniform plan. Mischer filed the deed dedicating section five in Montgomery County's property records, so Gordon was on constructive notice of the recitals in the deed as the recitals in the deed dedicating section five are in the chain of title to Gordon's home. And no summary-judgment

evidence shows the unnamed realtor Gordon referred to in his affidavit acted with implied or apparent authority on behalf of Mischer when selling Gordon his home.[28]

To sum it up, we conclude for the following four reasons that the trial court correctly granted Properties' and Preisler's motions for summary judgment. First, the summary-judgment evidence traces the title to the properties at issue—the Augusta course, the Biloxi course, and the former Charleston course—to a common grantor, RP Development. Second, both RP Development and Preisler presented summary-judgment evidence establishing that when RP Development and Mischer developed River Plantation, they carved out the Reserves and retained the Reserves for themselves without restricting the manner they could use the Reserves. The deeds and maps of record in Montgomery County do not restrict or contain covenants that restrict or limit RP Development or Mischer from using the Reserves for a specific purpose like golf. Third, the instruments used to dedicate the various sections of River Plantation bordering the Reserves (filed by RP Development and Mischer in the 60's and 70's and filed in official property records of Montgomery County) exclude the Reserves from the subdivision's uniform plan. Fourth, faced with evidence that RP Development and Mischer excluded the Reserves from the uniform

---

[28]*See Gaines v. Kelly*, 235 S.W.3d 179, 183-84 (Tex. 2007) (explaining the declarations of the alleged agent, without more, are incompetent to establish the existence or scope of the agency relationship).

plan, the Association failed to respond with summary-judgment evidence precluding the trial court from granting summary judgment for Properties and Preisler on their claims asserting no reciprocal easement exists on the Augusta, Biloxi, and the former Charleston courses.

We overrule the Association's first issue and hold the Association failed to raise a genuine issue of material fact precluding summary judgment on its reciprocal-easement claim.

B. Was the Association entitled to recover attorney's fees?

The Association raises two procedural arguments to support its claim that it should receive a new trial on its claim for attorney's fees. First, we will address the Association's complaint the trial court excluded evidence the Association offered to prove its fees were reasonable and necessary for the services of its attorney.

The Association's claim for attorney's fees against both Properties and Preisler is based on the Uniform Declaratory Judgments Act, the UDJA for short.[29] Under the UDJA, a party need not prevail at trial to recover attorney's fees because the statute allows a trial court a measure of discretion in deciding whether to award fees.[30] Even so, while there are several factors in deciding whether to award fees, the most critical factor courts must consider is whether the party prevailed on its

_____

[29]Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011.
[30]*Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998).

UDJA claim.[31] Assuming the trial court erred in excluding the Association's evidence, the Association never explains how the error was harmful even though the bills were marked in the hearing and they are among the exhibits in the appellate record. And on top of that, the Association was not the party who prevailed in the trial, and it has not prevailed in its appeal.[32]

We further find that even if the trial court erred in excluding the Association's evidence, the Association was not harmed by the error. The evidence shows the Association's members were on constructive notice of every recital in the instruments filed of record in Montgomery County's property records for the River Plantation subdivision, recitals that exclude the Reserves from the uniform plan that applies to the lots. Even had the trial court admitted the exhibit, we conclude the error probably did not cause the trial court to render an improper judgment or prevent the Association from properly presenting any argument in its appeal.[33]

Last, the Association argues the trial court erred in deciding whether an award of attorney's fees was "equitable and just" before empaneling a jury and allowing a

---

[31]*Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 712-713 (Tex. 2021).

[32]The Association presents the argument complaining about the trial court refusing to consider the evidence it offered on fees in a single sentence of its brief without citing any authority. Even so, we need not resolve its argument based on the Association's failure to cite legal authority to support its issue. *See Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 500 (Tex. 2015) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010)); *see also* Tex. R. App. P. 38.1(i).

[33]Tex. R. App. P. 44.1.

jury to decide what amount the Association should recover as a reasonable fee, if any, for the services that were necessary in the case for the services of its attorney.

The UDJA authorizes trial courts to award "costs and reasonable and necessary attorney's fees as are equitable and just."[34] Under the UDJA, decisions about whether to award an attorney a fee are placed in the trial court's sound discretion, and in the appeal, we review the trial court's decision about whether to award fees and if so how much using an abuse-of-discretion standard.[35] In deciding whether or not to award fees and deciding how much to award, we review the trial court's exercise of discretion based on four factors:

- the "fees must be reasonable[;]"
- the "fees must be necessary[;]"
- the fees must be equitable; and
- the fees must be just.[36]

The first two factors are questions of fact, while the last two are treated as questions of law.[37]

According to the Association, the trial court abused its discretion because it refused to consider evidence that addressed all four of the statutory UDJA factors

---

[34]Tex. Civ. Prac. & Rem. Code Ann. § 37.009; *Allstate Ins. Co. v. Irwin*, 627 S.W.3d 263, 270 (Tex. 2021).
[35]*Allstate*, 627 S.W.3d at 270.
[36]*Bocquet*, 972 S.W.2d at 21.
[37]*Id.*

before declining to award the Association anything on its claim for attorney's fees. To be fair, its argument might have had more traction if the argument was one being made by a party who prevailed. But neither Properties nor Preisler—although they prevailed—were not awarded anything for their fees. Even so, Properties and Preisler have not complained about the trial court's decision awarding them nothing for their fees. And we further note we have found no legal authority to support the Association's claim that it is an abuse of discretion for a trial court to decide it is *not* "equitable and just" to award a non-prevailing party fees under the UDJA before empaneling a jury to consider and decide what would be a reasonable and necessary fee for the services of the attorney for a party that did not prevail. It strikes us that empaneling a jury for that purpose under circumstances like these in most circumstances would create more legal expenses when the equities indicate the non-prevailing party is likely to leave without any award.

We conclude the trial court did not abuse its discretion by finding the Association, the non-prevailing party on its UDJA claim, was entitled to nothing in fees. Accordingly, we overrule the Association's second issue.

## Conclusion

We conclude the Association's members, like all purchasers of real property, are "bound by *every* recital, reference and reservation contained in or fairly disclosed

by any instrument which forms an essential link" in their respective chains of title.[38]

For that reason, we affirm the trial court's final judgment declaring that the Augusta, Biloxi, and Charleston golf courses are not burdened by a reciprocal-easement restricting Properties and Preisler from using their tracts in the Reserves for a purpose that differs from a recreational purpose like golf. We also affirm the trial court's judgment denying the claims of all parties to recover attorney's fees.

    AFFIRMED.

 

 

_____
HOLLIS HORTON
Justice

Submitted on August 19, 2021
Opinion Delivered April 28, 2022

Before Golemon, C.J., Horton and Johnson, JJ.

---

[38] *Westland Oil*, 637 S.W.2d at 908.